**Vivian HERNANDEZ, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 00–4794–CIV.**

United States District Court, S.D. Florida.

March 19, 2002.

Luis Alberto Segarra, Wheeler & Segarra, P.A., South Miami, FL, for plaintiff.

Michael Garrett Walleisa, AUSA, U.S. Attorney's Office, Miami, FL, for defendant.

## ORDER OF REMAND

HUCK, District Judge.

THIS CAUSE comes before the Court upon the Report and Recommendation of the Honorable Stephen T. Brown, United States Magistrate Judge, on Plaintiff's Motion for Judgment by the Pleadings and Defendant's Motion for Summary Judgment.

Based on the Defendant's response to Magistrate Judge Brown's Report and Recommendation, dated March 4, 2002, the Court has conducted a *de novo* review of the report and the record. The Defendant's brief response does not fully inform the Court on why remand should be made "pursuant to sentence four of 42 U.S.C. § 405(g)." Nevertheless, having reviewed the report and record with an eye to the full text of § 405(g), the Court agrees with the recommendation that new evidence should be considered on remand. In addition, the Court finds that entry of a final judgment now would be an inefficient use

of judicial resources in that any application for attorney fees would have to be litigated in two motions rather than one. Accordingly, Defendant's objections are overruled and it is

ORDERED AND ADJUDGED that the Report and Recommendation of Magistrate Judge Brown be RATIFIED, AFFIRMED, and made the Order of the District Court. Defendant's Motion for Summary Judgment [DE# 13] is DENIED. Plaintiff's Motion for Judgement By the Pleadings [DE# 17] is GRANTED. The decision of the Commissioner is REVERSED and REMANDED for further proceedings consistent with this Order.

## REPORT AND RECOMMENDATION

BROWN, United States Magistrate Judge.

This cause is before this Court on Plaintiff Vivian Hernandez's Motion for Judgment by the Pleadings and Defendant Commissioner of Social Security's Motion for Summary Judgment. This Court has reviewed the Motions and all pertinent portions of the record.

### Procedural Background

Plaintiff's mother, Gladys Hernandez filed an application on behalf of Plaintiff for SSI benefits on May 6, 1997, alleging that she has been mentally disabled since birth. T. 147. The Social Security Administration denied the application both initially and upon reconsideration. T.113–121, 127–29. At Plaintiff's request, hearings were held before an Administrative Law Judge ("ALJ") on November 10 and December 7, 1998, at which Plaintiff was represented by counsel and at which Plaintiff and her mother testified. T. 34–74, 75–112.

On May 5, 1999, the ALJ issued a decision in which she found that Plaintiff was not under a disability pursuant to the Social Security Act. T. 12–30. On October 27, 2000, after consideration of additional medical evidence (T. 266–78) the Appeals Council denied Plaintiff's Request for Review, rendering the ALJ's decision the "final decision of the Commissioner." T. 3–4. Plaintiff has filed this timely request for judicial review.

### Evidence

#### I. Testimony of Plaintiff

At the hearing on November 10, 1998, Plaintiff testified that she was born on December 22, 1979 and was 18 and in the 12th grade. T. 38. She attended school from 7:30 a.m. until 2:30 p.m., and was taking some special classes in English, reading, and math. T. 39, 45. Plaintiff stated that she was also in a drivers education class, but did not have a drivers license. T. 45.

Plaintiff was enrolled in the "DCT" job training program, but was not working at the time of the hearing. T. 39, 44. During the prior year, Plaintiff participated in Project Victory, an on the job training program. She worked for one month at Publix; stocking the shelves with cans, packaging bread, salads and meat, and bagging groceries. T. 40–41. She worked every day from morning until afternoon but was not paid, because she was in a vocational program. T. 41–42. The year prior, Plaintiff worked at Palmetto Hospital in the maternity department answering calls from the mothers and then advising the nurses who had called. T. 43, 79. She also worked in the kitchen, in the shredding room, and in the pharmacy stocking the shelves. T. 43, 79. Plaintiff could not recall how long she worked at the hospital, but it was longer than she had worked at Publix.

Plaintiff testified that she lived at home with her mother and father. T. 46. She stated that she has not been to a doctor in the last two years and only goes when she

is sick or when she needs a checkup. T. 47. Plaintiff stated that she was not seeing a counselor to discuss any problems. T47.

Plaintiff testified that she has one friend who lives across the street that she talks to on the phone. T. 47, 48. She also has three or four friends at school, and sees one of her friends after school. T. 49. Plaintiff likes to watch TV and listen to rap music but sometimes has problems understanding movies. T. 49–50. She stated that she does not read at home, but is required to read at school for 30 minutes. T. 50. Plaintiff testified that she does have some problems reading "big words." T. 52. Plaintiff does chores around the house such as cleaning her room, which includes making her bed, cleaning her furniture and sometimes changing her linens, washing the dishes, and cleaning the house. T. 52. T. 52–53. She also picks out her own clothes and dresses herself. T. 53.

Plaintiff testified that she does not take the bus to school because she is scared that something will happen to her. T. 48, 57. When asked about a statement made by Mr. Conroy, the teacher in charge of the Project Victory, that Plaintiff was able to do alphabetical filing without any assistance, Plaintiff disagreed with that, testifying that she did not do any filing. T. 58.

## II. *Testimony of Plaintiff's Mother*

Plaintiff's mother, Gladys Hernandez, testified through a Spanish interpreter. Mrs. Hernandez testified that she observed Plaintiff working at Palmetto Hospital on two days and that she was first in the maternity ward, answering telephones and taking water to the patients, then worked in the pharmacy pointing out gifts to customers. T. 61, 64. She stated that Plaintiff shredded papers, but she never observed Plaintiff doing any alphabetical filing. T. 65. Mrs. Hernandez testified that she observed Mr. Conroy with the students at Palmetto Hospital, and observed that all of the children they took to Palmetto were children with problems. T. 65–66. She stated that on one particular day, she observed Mr. Conroy talking to a child that appeared to be slow and Mr. Conroy was telling the child that when he or she finished at Palmetto, the child would be able to go to work, rent an apartment, and have a car. T. 67. Based on this she believed that Mr. Conroy "exaggerates things" and "places things . . . in a very, very favorable light." T. 69.[1]

## III. *Medical Evidence*

Plaintiff was first evaluated on August 7, 1989 (at age 9 and 8 months), by neurologist Oscar Papazian, M.D., at the Miami Children's Hospital, to assess her learning disability, and rule out mental retardation (T. 233–35). Previous IQ testing had shown scores placing her in the borderline range, and school assessments revealed achievement levels of first grade level for math, 1.3 level for reading and 1.9 level for spelling. *Id.* Special education classes had not yielded any progress. The neurological exam disclosed a short attention span, impulsivity, distractibility and difficulty in following visual and auditory sequential tasks. T. 233–35. Dr. Papazian concluded that Plaintiff had a learning disability, etiology unknown, suspected secondary to mental retardation secondarily increased because of her short attention span, impulsivity and mild hyperactivity. T. 234.

---

1. The record also contains an affidavit from Plaintiff's sister regarding this incident, in which she states that in her opinion as a teacher, Mr. Conroy had expressed "unrealistic goals," in that the particular student "had a speech impediment, he had difficulty relating to what Mr. Conroy was saying and did not physically look like he could control his hands while speaking." T. 144.

Her emotional immaturity probably was related to the borderline or mild mental retardation. T. 234. He recommended additional testing. T. 234.

On September 12, 1989, an MRI of Plaintiff's brain was normal. T. 231. On September 30, 1989, Plaintiff under went an EEG which was assessed as abnormal because of paroxysmal episodes of high amplitude, with slow wave activity noted over both temporal areas and in the second half of the recording, bilaterally, in the frontal central areas with prevalence to the left side. T. 226. Ricardo J. Pasencia, M.D. noted that clinical correlation was needed to determine whether this had any irritative properties in Plaintiff's learning disability. T. 226. A follow-up EEG with brain mapping was indicated. T. 226.

In October, 1989, while Plaintiff was in the fourth grade, she underwent a psychological evaluation by Mark Finkelstein, a school psychologist. T. 246–48. A Child Study Team Review indicated that Plaintiff was a very likeable but shy child who liked school and got along with others. T. 246. During testing, Plaintiff appeared to be highly anxious and her motivation was poor. T. 246. Testing indicated that she had auditory processing and memory deficits and was currently functioning on a first or second grade level in reading and math. T. 246–48. On the WISC–R, Plaintiff achieved a Performance IQ of 70, a Verbal IQ of 45, and a Full Scale IQ of 55. T. 247. Mr. Finkelstein recommended that Plaintiff remain in the Specific Learning Disabilities Program, be referred for a complete Speech/Language evaluation and a neurological evaluation, and that she have a highly structured classroom. T. 248. He noted that since her initial test, Plaintiff had shown a significant decrease on tests that measured her ability to abstractly define words, her comprehension of social situations, nonverbal abstract reasoning and visual analysis, synthesis and constructional abilities. T. 247.

On the Bender Visual–Motor Gestalt test, Plaintiff achieved an age equivalent of 5–6 to 5–8, showing deficient visual-motor coordination. Id. The psychologist concluded that Plaintiff's overall intellectual functioning fell in the mentally deficient range but that her potential was interfered with by neurological, emotional and motivational factors. T. 248. He added that deficits were found in the areas of visual-motor coordination, auditory memory and processing, comprehension-knowledge, among others. Id.

On April 21, 1991, Plaintiff underwent repeat testing by Sara Corado, Ph.D., a school psychologist. T. 249–53. Plaintiff's teachers had observed her to daydream often, to have auditory processing and memory deficits, that she had made minimal to no progress, that she had slow comprehension, was frequently confused, and that she lacked an understanding of things going on around her. T. 251. During testing, Plaintiff appeared to exert optimal effort at all times and approached the test in an organized manner. Id. Her attention span and concentration skills were within acceptable limits, and she followed instructions carefully. Her affect and eye contract was appropriate but she did not demonstrate age appropriate emotional interaction. Id. Motoric tasks were performed with the right hand and verbalization skills were not fluent for her chronological age. Id.

IQ testing revealed a Verbal IQ of 59, a Performance IQ of 71 and Full Scale IQ of 63, in the mentally deficient to borderline range. T. 252. Achievement testing revealed Plaintiff (at age 11 and 1 month) to be functioning at the first grade level in reading, second grade in spelling and third grade in math. Id. The Bender–Gestalt test scores reflected that she was function-

ing at the 5–9 to 5–11 year old level, suggesting a significant deficit in visual motor integration. Id. Recommendations included counseling, assistance with language and social skills, inclusion of Plaintiff in all classroom activities, use of visual aids, assignments at her grade level, positive reinforcement, and generous recognition before the group of any acceptable qualities and achievements. T. 253.

On March 10, 1992, neurologist Israel Alfonso, M.D., of Miami Children's Hospital indicated that Plaintiff had been seen for a follow-up visit. T. 229. She was borderline M2, Verbal IQ of 59, Performance IQ of 71 and Full IQ of 63, with a very short attention span. T. 229. Dr. Alfonso was skeptical that medication would be helpful because of Plaintiff's low IQ, but did prescribe Cylert 18.5 mg. and requested that her mother call in one week. Id.

The next medical record entry is not until August 12, 1997, subsequent to the application for benefits, when Plaintiff was evaluated by Lori Ben–Ezra, Ph.D. and Jack R. Weitz, Ph.D., both licensed psychologists. T. 255–56. IQ test scores were Verbal IQ 63, Performance IQ 69 and Full Scale IQ 65. T. 256. Plaintiff spoke both English and Spanish fluently and had no evident physical handicaps. T. 255. She did not present with a formal thought disorder, and she had appropriate affect and motor activity with no evidence of any memory impairment. T. 255. She did present as functioning in the mentally deficient to borderline range and exhibited minimal insight and concrete reasoning. T. 255. Her social judgment appeared commensurate with her intellectual ability. Test results revealed scores falling within the mentally deficient range of intellectual functioning. T. 256. The psychologists concluded that Plaintiff had mild mental retardation, that the cognitive deficits would affect her ability to function in most

job environments, and that she possibly would require assistance in managing her own benefits due to her difficulty in counting money. Id.

On April 16, 1998, after the original order denying benefits had been issued, Agency review consultant psychologist Thomas L. Clark, Ph.D. rendered a Mental Residual Functional Capacity Assessment, based on a review of the evidence in the file. T. 200–202. Dr. Thomas found that Plaintiff was only moderately limited in:

— understanding and remembering detailed instructions;

— carrying out detailed instructions;

— traveling in unfamiliar places; and

— setting realistic goals or making plans independently of others.

T. 200–01. He found that Plaintiff was not significantly limited in the following areas:

— remembering locations and work-like procedures;

— understanding and remembering very short and simple instructions;

— carrying out very short and simple instructions;

— maintaining attention and concentration for extended periods;

— performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances;

— sustaining an ordinary routine without special supervision;

— working in coordination with or proximity to others without being distracted by them;

— making simple work-related decisions;

— completing a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods;

— interacting appropriately with the general public;

— asking simple questions or requesting assistance;

— getting along with coworkers or peers without distracting them or exhibiting behavioral extremes;

— maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness;

— responding appropriately to changes in the work setting; and

— being aware of normal hazards and taking appropriate precautions.

T. 200–01. Dr. Thomas elaborated as follows:

Well-functioning mild M R adult, capable of a broad range of ADRs but with some restriction for more complex tasks. Able to relate normally, understand and retain simple instructions, and persist on tasks (within her skill levels) at good pace for full 8 hour day.

T. 202.

## IV. Non–Medical Evidence

The record contains a portion of an "Individual Education Plan" ("IEP") from Dade County Public Schools, Office of Exceptional Student Education, contained in an "Annual Review" dated June 2, 1997 when Plaintiff had completed the 10th grade, which states that Plaintiff's performance levels as of May 1997 were 5.3 in math, and 3.2 in reading. A notation states that these "scores are a direct indication of her ability and her level of functioning." T. 224–25. Although it is not clear who made these notations, the report contains the signature of Plaintiff's teacher L. Schacker. T. 224.

Five months later, on November 20, 1997, Plaintiff was evaluated by Linda C. Brown, a "school psychologist." Test results differed from those performed in June, indicating that Plaintiff was only functioning at the third-grade level in math and at the second grade level in reading. T. 257. The report notes that Plaintiff's "teachers say that she is well adjusted[,] socially appropriate, [and] her attendance is good," and that Plaintiff was interested in pursuing a career in child care. T. 257. The recommendation was continued assistance from the Exceptional Student Education Program. Id.

The record also contains a "Reevaluation" IEP dated February 20, 1998, (when Plaintiff was in the 11th grade). Included within the report is a copy of a June 2, 1997 "Individual Transition Plan" ("ITP"), which recites the performance levels found in the June IEP, as well as the following notation: "Vivian would like to work with children in a day care setting. She would like to continue living at home and use bus transportation." T. 222. Id. However, under the "Notes" section of the February 20, 1998 Reevaluation IEP, it states that Plaintiff's total reading score was 2.1 and math was 3.5, reflecting the lower scores obtained by Ms. Brown in November, 1997.

Plaintiff's report card for the period from November 12, 1997 through January 28, 1998 revealed grades of As, Bs and Cs. T. 259. A teacher comment was that Plaintiff "puts forth maximum effort; very cooperative" and "shows excellent class attitude." T. 259.

A Report of Contact dated April 16, 1998, reveals the following report from James Conroy, Plaintiff's vocational training teacher:

[Mr. Conroy] stated that [Plaintiff's] physical, speech, hearing and vision are good. She is a slow reader and is weak in math. Her common sense skill, socialization, mobility, punctuality is [sic] excellent. She has worked at Publix in the several depts. And succeeded very

nicely, no work related problems or issues. She is currently working at Palmetto Hospital in the maternity, kitchen and clerical work. She is able [to do] alphabetical filing without any assistance. Her only limitations is [sic] reading and math which probably is equivalent to a 5th grade level. She is currently in a job training program with Palmetto Hospital and is doing well ... she has a slightly lowered functioning, academically, mainly a slow reader... [Plaintiff] does not present any behavior problems.

T. 218.

A Report of Telephone Contact dated May 12, 1998 indicates that the following message was left by Mr. Conroy:

... her academic functioning is low. Ok when I say low. She is probably in the fourth [or] fifth grade level as far as Reading Math. Physical ability, common sense ability and all the rest. She is no problem whatsoever. If she [were] to decide tomorrow morning that she wanted the job at Publix bagging groceries, working there. She would have no difficult [sic] at all obtaining that job and keeping that job with no assistance at this point, ok. And I say that. She has worked here in a training program at Publix's last year. And this past year she has worked at Palmetto Hospital in a training program, not only in the kitchen, but also in the maternity area and also in a clerical area. Her performance has been excellent. She has been able to do it unassisted, ok ... Her

academic functioning is the only limitation that she has.

T. 219.

### IV. *Testimony of Vocational Expert*

Rehabilitation consultant Pedro Roman testified at the hearing held on December 7, 1998. Mr. Roman noted that because Plaintiff has no past relevant work, there was no issue with regard to transferability of skills. T. 79. Mr. Roman based his testimony as to job availability on Dade and Broward Counties and had separate statistics for Palm Beach County, as well as nationally. T. 79–80.

The ALJ asked Mr. Roman to assume the following as the limitation factors with respect to Plaintiff: 19 year old woman, presently in the 12th grade; in Special Ed classes for English, reading and math; attended a driver's ed program, but does not have a driver's permit; participated in on the job training programs; and literate in English. T. 80–81. The ALJ further requested Mr. Roman to assume for purposes of the hypothetical: no physical limitations exist, but cognitive limitation is limited to performing unskilled work with a specific vocational preparation ("SVP") of 1, with a best of 2.[2] T. 80–81. The ALJ requested Mr. Roman to further assume: Plaintiff has a fair[3] ability to follow work rules and deal with the public; between fair and poor ability to use judgment and to maintain attention and concentration; and fair ability to interact with supervisors, deal with work stress and function independently. T. 81. He was also to assume with regard to making performance adjustments, that Plaintiff had no

---

2. Mr. Roman explained that an SVP of 1 requires a short demonstration only, and SVP of 2 requires anything beyond short demonstration up to and including 30 days or less. T. 85.

3. The ALJ provided the following definitions: "good" is defined as ability to function in this area more than satisfactory, "fair" is defined as ability to function in this area is limited, but satisfactory, and "poor" is ability to function in this area is seriously limited, but not precluded. T. 81.

useful ability in understanding, remembering and carrying out detailed but not complex job instructions, and a fair ability to maintain personal appearance, and behave in an emotionally stable manner. T. 82. He was also to assume that Plaintiff can engage in simple repetitive tasks, but needed a quick supervisor check every two hours. T. 82.

Based on this hypothetical, Mr. Roman testified that Plaintiff could perform a job as a "airline security rep." [4] (DOT [5] # 372.667–010), which is classified as light work with a maximum SVP of 2. T. 83, 86. The job falls under the SOS classification 426 and is unskilled. T. 84. Mr. Perez testified that there were 721 jobs in the light category in the Dade and Broward area. T. 84. In the national economy there were 33,718 such jobs. T. 85.

Mr. Roman testified that other jobs which Plaintiff could perform under this hypothetical were car wash attendant, fast food worker, buckle wire inserter, stringer, and button assembler, and bagger. T. 90–95. Mr. Roman testified that significant numbers of these jobs exist in the local and national economy.[6] Mr. Roman also discussed the general educational development requirement for these jobs, which corresponds to the reasoning, math and language level that the individual would need to be able to perform those jobs according to the Dictionary of Occupational Titles:

— airline security rep—reasoning—2; math—1; language—2.

— car wash attendant—reasoning—2; math—2; language—1.

— fast food worker—reasoning—2; math—2; language—2.

— buckle wire inserter—reasoning—1; math—1; language –1

— stringer—reasoning—1; math—1; language—1.

— button assembler—reasoning—1; math—1; language—1.

— bagger—reasoning—2; math—1; language—1.

T. 96–97;104–05.[7]

Mr. Roman testified that the jobs of buckle wire inserter, stringer, button assembler and bagger would require good visual and motor coordination and the person needs to be quick with their hands. T.

4. Mr. Roman testified that these are people that are in the airport checking whether a person has a valid airline ticket and asks people to put their luggage in the conveyor belt, as well as matching luggage with tickets at arrival. This job does not require a gun permit. T. 86.

5. Dictionary of Occupational Titles.

6. Mr. Roman further stated that with respect to the buckle wire inserter and button assembler, the last time the DOT revised the listing was in 1991 and the last time it was reviewed was in 1977. T. 107. He explained these particular jobs have been pushed out by advances in technology. T. 108. With respect to the statistics of buckle wire inserter, he explained that there are 320 different DOT's contained within that particular classification, so he has no way of knowing the actual incidence of buckle wire inserter. T. 108–09.

7. Mr. Roman explained the following relationships: the reasoning requirement of level 1 is less than third grade, and is applied common sense, which is understanding to carry out one or two step instructions. T. 97. The reasoning of a level 2 corresponds to the sixth or seventh grade. This requires applied common sense and understanding to carry out detailed or involved written or oral instructions, and dealing with problems involving a few concrete variables in or from standardized situations. T. 111. The mathematical development for level 1 is a fourth grade level or below, which corresponds to ability to add and subtract two digit numbers, multiply and divide 10's and 100's, by 2, 3, 4, 5; perform the four basic arithmetic operations with coins, as part of a dollar; and perform the operations with units such as cup, pint, and quart. T. 98. In regard to language development, level 1 corresponds to sixth grade or better. T. 105.

99. Mr. Roman further testified that fast food workers would have to use a certain amount of quickness in preparing what the customer ordered. T. 99–100. All of the jobs listed require that the person be able to function independently. T. 100.

Plaintiff's counsel asked Mr. Roman to assume that Plaintiff has poor capacity to function independently, and to retain, pay attention and concentration, poor ability to understand and carry out simple instructions, and poor ability in terms of her visual and motor coordination. T. 100–01. Mr. Roman testified that considering these limitations, he would have to strike the airline security rep. job. T. 101–02. He would also have to strike car wash attendant and fast food worker, based on the limitations of poor performance in functioning independently and understanding simple instructions, as well as poor ability with visual and motor coordination. T. 102. He would also strike the assembler jobs based on the poor ability to function independently. T. 102. With respect to the bagger job, the only situation that he would strike that job would be if the person was unable to use judgment where she would put some glass in with other items that are breakable. T. 102. The job of a bagger would not require, in his personal observation, that the individual be supervised. T. 102. If the individual is unable or has poor ability to function independently, as in needing to be supervised with fair amount of frequency, Mr. Roman would also strike that job. T. 102–03.

Mr. Roman testified that as to the second hypothetical, he was assuming that the reasoning, math, and language development was at best, level 1. Under this assumption the job of airline security rep, car wash attendant, fast food worker, and bagger would be eliminated. T. 106.

Finally, Mr. Roman noted that there was never a statement obtained from Dr. Weitz, who performed a consultative evaluation of Plaintiff in August of 1997, as to what he thought Plaintiff could still do despite her cognitive deficits, and that it would be advisable to do so in order to obtain a complete consultive evaluation. Mr. Roman further noted that at the time of the evaluation, Plaintiff was still under the childhood disability rules, but since December of 1997 to present time, the adult rules apply. T. 111.

## V. Post Hearing Evidence Submitted to Appeals Council

On September 2, 1999, after the ALJ rendered her decision, Plaintiff was examined by Gustavo J. Rey, Ph.D., Clinical Psychologist. T. 272–73. Plaintiff was accompanied by her mother, who reported that Plaintiff was preoccupied with her future when her parents were no longer around to help her. T. 272. There were no affective or behavioral concerns. T. 272. Plaintiff was independent in activities of daily living but unable to drive or handle her finances. T. 272. She was reported to be highly distractible, with poor learning capacity, and requiring "immediate supervision because she gets lost easily. . . ." T. 272. During the testing, Plaintiff was reported to be pleasant and cooperative, as well as alert and oriented to person, place and year, but slightly disoriented to date. T. 272. Her verbalizations were immature in nature with poorly developed capacity to express conceptual issues. Motor behavior was noted to be unremarkable. Affective presentation was appropriate to the circumstances, but childish and immature. T. 272.

IQ scores were Verbal IQ 64, performance IQ 70, and Full Scale IQ 64. T. 273. Dr. Rey's impressions were that Plaintiff was functioning within the impaired range of overall intellectual functioning and that it was evident that, due to

her intellectual limitations, she was unable to maintain gainful employment, but there were no current indications of an affective or behavioral disorder. T.273. Dr. Rey's recommendations were that due to her intellectual limitations, Plaintiff would benefit from continued supervision from family members when performing complex activities of daily living, and that she should participate in structured programs, emphasizing social development as well as maximizing her capacity to function independently in daily life. T. 273.

Dr. Rey completed a residual functional capacity (RFC) form about Plaintiff's mental functioning based on restrictions which Dr. Rey opined have been present since May 6, 1997. T. 274–78. He advised that he had reviewed records from Dr. Brown, Dr. Weitz, and the multidisciplinary team. Dr. Rey's diagnosis was mental retardation. T. 274. He checked blocks on the RFC form indicating that, in his opinion, Plaintiff would have extreme limitations dealing with work stresses, marked limitations in following work rules, dealing with the public, using judgment; functioning independently, and maintaining attention/concentration; and moderate limitations relating to coworkers, interacting with supervisors, maintaining personal appearance, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. T. 276–77. Dr. Rey further found that Plaintiff had extreme limitations in understanding, remembering and carrying out complex job instructions, marked limitations in understanding, remembering and carrying out detailed but not complex job instructions, and moderate limitations in understanding, remembering and carrying out simple job instructions. T. 277.

## V. Analysis of Disability/ALJ's Findings

Because Plaintiff is seeking benefits for a period of time during which she was under age 18 (prior to December 22, 1997), as well as for the period during which she was age18 and older, two different analyses must be applied.

### A. *Under 18*

Under regulations promulgated by the Commissioner in 1996, an individual not yet 18 must suffer from a medically determinable physical or mental impairment (or a combination of such impairments) which results in marked and severe functional limitations and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. Pub.L. No. 104–193 § 211(a)(4)(C), 110 Stat. 2105 (1996). For an impairment to be deemed to result in marked and severe limitations, it must meet or medically or functionally equal the requirements listed in the Listing of Impairments in Appendix 1, Subpart P ("the Listing")..

The ALJ must apply the following sequential evaluation to determine whether an individual not yet 18 has a disability (or combination of disabilities) thereby entitling the individual to SSI benefits:

1. Whether or not the claimant is engaged in substantial gainful activity;

2. Whether or not a claimant has a severe impairment within the meaning of the Social Security Act—that is whether or not the impairment "causes more than a minimal limitation in one's ability to function in an age appropriate manner";

3. Whether or not the severity of a claimant's impairment(s) meets or medically or functionally equals the requirements listed in the Listing of Impairments in Appendix 1, Subpart P of the Social Security Act;

4. And finally, pursuant to the following four-step analysis, whether an impairment or a combination of impair-

ments is functionally equivalent to a listed impairment. 20 C.F.R. § 416.926a (a), (f).

 a. Whether there are disabling limitations of specific functions such as walking or talking;

 b. Whether there are disabling limitations resulting from chronic illnesses that are characterized by frequent illnesses or attacks, or exacerbations and remissions;

 c. Whether there are disabling limitations resulting from the nature of the treatment required or the effects of medication;

 d. And whether there are disabling limitations in broad areas of functioning, such as social functioning, motor functioning, and personal functioning. The six broad Areas of functioning that exist under this method are: cognitive/communicative, motor, social, responsiveness to stimuli (from birth to age 1 only), personal (age 3 to 18 only) and ability to maintain concentration, persistence or pace (age 3 to 18 only).

### B. *Adult Standard*

■ Regulations promulgated by the Commissioner establish a five-step analysis to determine disability in an adult. 20 C.F.R. § 416.920(a)—(f). If the claimant is presently employed, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. § 404.1520(b). At step two, a determination must be made deciding whether the claimant suffers from a severe impairment or combination of impairments; if not, then non-disability is found. 20 C.F.R. § 404.1520(c). If step three is reached, a comparison is made between the claimant's impairments and those listed in 20 C.F.R. § 404, Subpart P, Appendix 1. If the impairment meets or equals those within the listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). The fourth step in-

volves a determination as to whether the impairments prevent the claimant from performing past relevant work. The claimant has the initial burden of showing the inability to perform previous work. *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir.2001); *Lucas v. Sullivan,* 918 F.2d 1567, 1571 (11th Cir.1990). Once this showing is made, the burden shifts to the Commissioner to prove the existence in the national economy of other types of substantial gainful employment that the claimant can perform. *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir.1987); 20 C.F.R. § 404.1520(e), (f).

### C. *ALJ's Findings*

In this case, the ALJ based her decision that Plaintiff was not disabled at any time through the date of the decision on the following findings:

— Plaintiff suffers from the severe impairment of mental retardation (20 C.F.R. §§ 416.920(c) and 416.924(c)); but the impairment does not meet or equal an impairment in the Listings;

— prior to December 22, 1997, Plaintiff had no limitations in communication, motor or social functioning; she did have a marked impairment of cognition but her ability to maintain concentration, persistence or pace, as well as her personal functioning was less than markedly impaired; and therefore Plaintiff's impairment was not functionally equivalent to Sections 112.05D or 112.05E, Appendix 1, Subpart P, Regulations No. 4 prior to December 22, 1997;

— Plaintiff's mother's testimony was not fully supported or credible;

— Since at least December 22, 1997, Plaintiff has the maximum remaining ability to perform work at all exertional levels, is able to make occupational and performance adjustments in jobs involv-

ing simple instructions, and essentially has the residual functioning capacity to perform the exertional and non-exertional requirements of a wide range of unskilled work at all exertional levels.[8]

— Section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and section 204.00 of Appendix 2, Subpart P, Regulations No. 4, provide a framework for a conclusion that, considering the claimant's residual functional capacity, age, education, and work experience, she is not disabled and can perform a significant number of jobs at all exertional levels in the national economy, despite her non-exertional limitations.

T. 28–29.

## DISCUSSION

### I. *Scope of Review*

The scope of judicial review of factual findings in a disability case is limited to a determination of whether the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *Martin v. Sullivan*, 894 F.2d 1520 (11th Cir.1990). Substantial evidence is more than a mere scintilla; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir.1997) (quoting *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). Even if this Court finds that the preponderance of the evidence weighs against the Secretary's decision, an affirmance is required if the decision is supported by substantial evidence. *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir.1991). In determining the existence of substantial evidence, this Court must scrutinize the entire record, taking into account evidence both favorable and unfavorable to the Secretary's decision. *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir.1987).

■ The Commissioner's failure to apply the correct legal standards or to provide the reviewing Court with a sufficient basis for a determination that proper legal principles have been followed mandates reversal. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir.1995); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990); *Gibson v. Heckler*, 779 F.2d 619, 622 (11th Cir.1986).

### II. *Plaintiff's Claims*

In arguing for reversal and/or remand, Plaintiff raises the following four issues:

A. Whether the Commissioner erred in finding that Plaintiff's mental retardation, learning disability and deficient visual-motor skills did not meet or equal Section 112.05(D), and whether she further erred in concluding, for the period after 12/22/97, that these impairments did not meet or equal section 12.05 C.?

B. Whether the Commissioner erred in failing to obtain a medical source statement (MSS) from the consulting, examining psychologist since the record was devoid of any recent analysis of functional capacity by a physician or other expert?

C. Whether the Commissioner met her burden of showing Plaintiff could perform other jobs existing in the national and regional economies?

D. Whether the Social Security Administration Appeals Council erred in failing to act upon clearly probative new and material evidence submitted with the request for review?

---

8. The ALJ found that Plaintiff's retained mental capacities include "at the least: understanding, remembering and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled work—i.e., simple work-related decisions; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting." T. 26.

## A. The Listings

Listing Section 112.05 provides, in pertinent part, as follows:

112.05 Mental Retardation: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.

The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.

\* \* \* \* \* \*

D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function: ...

There is no question that Plaintiff satisfied the initial IQ portion of part D. Plaintiff argues that the ALJ erred in not finding that Plaintiff had the "other mental impairment" of a learning disorder (i.e., delay in math or reading) and/or deficient visual-motor coordination. (citing *Hall v. Apfel*, 122 F.Supp.2d 959 (N.D.Ill.2000)) (citing Childhood Disability Evaluation Issues, SSA Pub. No. 64–076 p. 49 and n. 3 (March 1998)).

In discussing Plaintiff's learning and cognitive abilities, the ALJ accepted the evaluation contained in the June 2, 1997 Individual Transition Plan ("ITP") which indicates that Plaintiff scored a 5.3 and a 3.2 in reading. The ALJ also relied on the Reports of Contact by Mr. Conroy, Plaintiff's vocational teacher. T. 19–20. The ALJ rejected the findings made by school psychologist Linda Brown in November 20, 1997, who stated that test results indicated that Plaintiff was functioning at the third-grade level in mathematics and at the second grade level in reading. The ALJ also referenced the work Plaintiff had performed in the vocational program, as well as the testimony of Plaintiff herself, who testified that she did read books and stories at school.

In rejecting the opinion of psychologist Linda Brown, the ALJ stated:

The subsequent testing in November 1997 by someone purporting to be a school psychologist did reflect lower reading and mathematics abilities but the specific qualifications of the examiner are uncertain; she is not identified as someone with a doctor's degree in psychology or a licensed psychologist anywhere on the report. Hence, the information provided by Mr. Conroy is fully accepted.

T. 20. The ALJ also noted the fact that Ms. Brown's findings of November 1997 significantly differed from the results obtained only six months prior and noted in the Individual Transition Plan. T. 17.

There are several problems with the ALJ's analysis on this point. First, as Plaintiff notes, there are no qualifications provided for the person who made the findings as to the higher cognitive levels in the June 1997 ITP—in fact, it is unclear exactly who made that assessment. Furthermore, it is apparent that a "Reevaluation" was performed within six months of those scores, and the testing results were significantly reduced.

With respect to the ALJ's reliance on Mr. Conroy's statements, Mr. Conroy was also not established to be "someone with a doctor's degree in psychology or a licensed psychologist." Rather, Mr. Conroy was described as a special education teacher. Furthermore, the ALJ herself described Mr. Conroy's report as stating that Plaintiff "was *probably* at a fourth or fifth grade level in reading and mathematics, he *guessed*." (emphasis added). T. 18. When this is combined with the testimony from Plaintiff's mother as to the possible "unrealistic expectations" held by Mr. Conroy, the Court finds that there is not substantial evidence to support the ALJ's reconciliation of the evidence concerning

Plaintiff's developmental status, and finds that the record must be further developed, as indicated in the following section.[9] At remand, inquiry can also be made into the current status of Plaintiff's visual-motor coordination.

## B. Whether the Commissioner erred in failing to obtain a medical source statement (MSS)

Plaintiff points to the following statement in the ALJ's decision:

There are no medical source statements from any treatment sources; the claimant, as mentioned, has not been under treatment. The consultants who did the testing in August 1997 indicated that the demonstrated cognitive deficits would affect the claimant's ability to function in most job environments. However, no specific details as to functional limitations was offered.

T. 25. The ALJ then indicated her reliance on the RFC statement rendered by Dr. Thomas, the non-examining State Agency review physician, which was reviewed at the reconsideration level. T. 25.

The Court agrees with Plaintiff that the ALJ erred in not obtaining a medical source statement from the consultants who actually examined Plaintiff. Although the ALJ stated that she was accepting the Dr. Thomas' statement, which she found to be "consistent with the medical evidence," certain of the findings she ultimately made with respect to Plaintiff's residual capacity do not match that statement.[10] Therefore, it appears, as Plaintiff suggests, that the ALJ may have improperly "played the role of medical expert, interpreted the raw psychological and medical data, and drew her own conclusions as to the claimant's RFC." *See Marbury v. Sullivan,* 957 F.2d 837, 840–41 (11th Cir.1992) (Johnson, J. concurring) (ALJ cannot act as both judge and physician); *see also Manso–Pizarro v. Secretary,* 76 F.3d 15, 17–19 (1st Cir.1996) (noting that an ALJ, as lay person, is not qualified to interpret raw data in a medical record); *Rohrberg v. Apfel,* 26 F.Supp.2d 303, 311 (D.Mass.1998) (stating that when the medical findings merely diagnose the claimant's impairments and do not relate the impairments to specific residual functional capabilities such as those set out in 20 C.F.R. § 404,1567(a), the Commissioner may not make that connection himself).

Even the vocational expert expressed his opinion that the consultants should have provided an MMS in order to assess what Plaintiff was still able to do despite her limitations.[11] T.111. Accordingly, the

---

9. The ALJ found that Mrs. Hernandez' testimony on this point was not credible, relying in significant part on her limited English language ability. However, Plaintiff's sister, who was not shown to be deficient in the English language, also submitted an affidavit as to this issue.

10. Plaintiff points to the following examples: Dr. Thomas opined that Plaintiff was not significantly limited in sustained concentration and persistence (T. 200), but the ALJ assessed a fair (limited but satisfactory) to poor (seriously limited but not precluded) ability in this area. T. 81. Dr. Thomas assessed no limitations in the area of making simple work-related decisions (i.e. using judgment) whereas the ALJ assessed Plaintiff's ability as fair to poor. T. 80, 2000. Dr. Thomas assessed moderate limitations in claimant's ability to carry out detailed instructions, whereas the ALJ assessed no useful ability (i.e. none or extreme). Finally, the ALJ's reference to claimant's need for supervision check every two hours conflicts with Dr. Thomas' MSS which assessed no limitation in claimant's ability to sustain an ordinary routine without supervision. Therefore, it appears that the ALJ rejected significant portions of the non-examining consultant's MSS in favor of other medical evidence, but accepted other portions, without explanation, while claiming that the MMS was "consistent with the medical evidence."

11. The Regulations impose a duty on the ALJ to obtain missing information when a consul-

Court finds that the case should be remanded in order that the examining consultants can render their opinion as to Plaintiff's functional capacity, based on their examination, particularly based on their statement that Plaintiff's cognitive deficits "would affect her ability to function in most job environments."

### C. Could Plaintiff could perform other jobs existing in the national and regional economies?

This issue will have to be readdressed on remand, based on the ALJ's determination of the Plaintiff's retained abilities.

### D. Was New and Material Evidence Submitted to the Appeals Council?

 Plaintiff argues that the Appeals Council erred in not considering the report of Dr. Rey as new and material evidence (see 20 C.F.R. § 416.1470(b)), and/or that the case must be remanded for purposes of consideration of this evidence. A Court may remand for the consideration of new and material evidence if (1) the evidence is new and noncumulative; (2) the evidence is material such that reasonable possibility exists that the new evidence would change the administrative results; and (3) good cause exists for the claimant's failure to submit the evidence at the appropriate administrative level. *Falge v. Apfel,* 150 F.3d 1320, 1323 (11th Cir.1998), *cert. denied,* 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 905 (1999).

Defendant concedes that the evidence is new, in that it was not in existence at the time of the original proceedings. However, the Defendant argues that its materiality is "questionable." The materiality of newly submitted evidence requires that such evidence would justify a remand if there is a reasonable possibility that such evidence would have changed the outcome of the Commissioner's determination. *Falge,* 150 F.3d at 1323.

The Court finds that a reasonable probability does exist that Dr. Rey's report would have changed the outcome of the ALJ's determination, considering the lack of an MMS from an examining physician. As previously noted, the ALJ made certain findings as to Plaintiff's ability to perform in the work environment, citing Dr. Thomas' assessment, but yet some of those findings were not supported by Dr. Thomas' report. Accordingly, the Court finds that this evidence should be considered on remand.

### *Recommendation*

Accordingly, it is respectfully recommends as follows:

1. That Defendant's Motion for Summary Judgment be **DENIED**;

2. That Plaintiff's Motion for Summary Judgment be **GRANTED**, and that the decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings consistent with this Report and Recommendation.

The parties have ten (10) days from the date of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Paul C. Huck, United States District Judge for the Southern District of Florida. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger,* 847 F.2d 745 (11th Cir.1988), *cert. denied,*

---

tative evaluation is incomplete. 20 C.F.R. § 416.919p(b). The Regulations also provide that a complete consultative examination should include a statement about what the claimant can still do despite his or her impairments. 20 C.F.R. § 416.919(c)(6).

488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988).

March 4, 2002.