**Carolyn D. BROWN, Plaintiff,**

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.**

**No. CIV.A. 03–G–2501–S.**

United States District Court,
N.D. Alabama,
Southern Division.

July 12, 2004.

Darryl W. Hunt, Marilyn H. Macey, Clark & James LLC, Birmingham, AL, for Carolyn D. Brown, plaintiff.

Alice H. Martin, U.S. Attorney, Lane H. Woodke, U.S. Attorney's Office, Birmingham, AL, Mary Ann Sloan, Social Security Administration–Office of General Counsel, Atlanta, GA, for Jo Anne B. Barnhart, Commissioner of Social Security Administration, defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

Plaintiff brings this action pursuant to the provisions of section 205(g) of the Social Security Act, [hereinafter the Act], 42 U.S.C. § 405(g),[1] seeking judicial review of

---

1. 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for Supplemental Security Income [hereinafter SSI].

a final adverse decision of the Commissioner of Social Security [hereinafter Commissioner]. Plaintiff's first application for a period of disability and disability insurance benefits under sections 216(i) and 223 of the Social Security Act, as amended, was filed April 30, 1993, as was an application for SSI as provided under Section 1601 of the Act, 42 U.S.C. §§ 1381 *et seq.* On December 27, 1994, the ALJ awarded benefits, using December 24, 1992, as the onset date. Disability was caused by pain in the neck and shoulders and limited use of the hands. Ms. Brown received Disabled Widow's Benefits [DWB] from March 1998 based on the death of her husband.

In May 1998 the Administration began a continuing disability review and sent plaintiff to consulting physician Jeffry G. Pirofsky for evaluation. The evaluation took place May 20, 1998. Dr. Pirofsky's concluding sentence of a four page report read: "The patient was actually doing relatively well for someone with all of her illness."[2] Based on this sentence, on July 1, 1998, the Administration found medical improvement had occurred and ended plaintiff's disability status in July 1998. Benefits were terminated in September 1998. A July 13, 1998, appeal was denied on reconsideration May 27, 1999.

Reconsideration of a second appeal was denied April 3, 2000, based on a March 29, 2000, negative decision by Hearing Officer Jane B. Trimm.[3] A hearing was held June 5, 2001. On August 29, 2001, the ALJ [Jerome L. Munford] denied benefits, finding medical evidence established severe impairments of cervical disc disease, status post cervical fusion; history of carpal tunnel syndrome, status post bilateral carpal tunnel release; hypertension; bunions and plantar warts. He found a Residual Functional Capacity [RFC] for light work with eight restrictions[4] including a sit/stand option, preventing her from performing past work. He made no finding as to whether plaintiff's skills are transferable, but did state in the body of the decision she had "some transferable skills."[5] The decisions were appealed September 6, 2001, when a copy of the hearing tape was requested in order to submit argument. On May 13, 2003, the Appeals Council sent the tape. The Appeals Council denied the appeal July 11, 2003.

In the interim Ms. Brown filed a new claim September 20, 2001. A favorable decision was rendered without need of a hearing. Plaintiff was found disabled from September 1, 2001. The Appeals Council found the new decision did not change the

---

**2.** The court will discuss his entire report later in the opinion.

**3.** Part of her analysis reads as follows: "Currently, the claimant has degenerative disc disease of the cervical and lumbar spine, obesity, and hypertension; ...." In the initial determination and transmittal SSA representative Trimm listed a primary diagnosis of "Disorders of back (discogenic and degenerative)" and a secondary diagnosis of "Obesity and other hyperalimentation." ALJ Munford omitted these diagnoses from his list of severe impairments and from his consideration. He added bunions and plantar warts to the originally listed severe impairments.

**4.** "The claimant has the residual capacity to perform light work which allows for no push-

ing or pulling involving the upper or lower extremities; no frequent bending, squatting, stooping, climbing, or crawling, and a sit/stand option. Any testimony or allegations of the claimant otherwise are not credible."

**5.** Vocational expert Dr. Fain Guthrie testified that if the Physical Capacities Evaluation of record completed May 16, 2001, by Benjamin Dale, P.A. were credible plaintiff would not be capable of performing any work. The accompanying pain assessment form completed the same date by Mr. Dale described her pain as sufficiently severe to distract her from the task of a job and would cause her to totally abandon tasks. See opinion at 1270–71 for discussion.

earlier decision that had discontinued her benefits. This action for judicial review was filed by and through counsel with this court September 9, 2003. Plaintiff's request for review by the Appeals Council was denied. An appeal to this court followed.

The issue before the court is whether plaintiff was disabled between July 1998 to August 29, 2001, the time between the two periods granting disability.

■ As stated earlier, plaintiff's disability was discontinued on the basis of the last sentence of the four page evaluation of Dr. Pirofsky: "The patient was actually doing relative well for someone with all of her illness." This sentence, however, does not state plaintiff had medical improvement (as was interpreted) and no longer disabled. Neither does anything else in the evaluation. As part of his evaluation Dr. Pirofsky had plaintiff's medical records from 1994, and the office notes of April 4, 1994, where plaintiff was seen at Neurosurgery Clinic at UAB. A MRI demonstrated a disc bulge at C5–6 with no cord compromise. She was diagnosed with spondylosis but no operative pathology. Plaintiff reported to Dr. Pirofsky it was painful for her to look after herself and she had to do so slowly and carefully. She was unable to lift or carry anything at all. Pain prevented her from walking more than a quarter of a mile. Pain prevented her from sitting more than one hour or standing more than 30 minutes. She had to have medication in order to sleep. Her social life was restricted. Pain prevented her from traveling except to the doctor or the hospital.

Plaintiff was taking the following medication at the time of the evaluation by Dr. Pirofsky:

Extra strength Tylenol;

HCTZ;[6]

Naprosyn:[7]

Flexeril;[8]

Prempro;

Chlorpheniramine.[9]

Dr. Pirofsky's review of plaintiff's symptoms reads as follows:

6. HCTZ (hydrochlorothiazide) is a thiazide diuretic. It increases the amount of water and salt lost in urine and decreases edema. *Hydrochlorothiazide/irbesantan*, at http://www.drugs.com/hctz.html (visited June 29, 2004).

7. Naprosyn is a nonsteroidal anti-inflammatory drug used to relieve the inflammation, swelling, stiffness, and joint pain associated with rheumatoid arthritis, juvenile arthritis, ankylosing spondylitis, tendinitis, bursistis, and acute gout. It is also used to relieve menstrual cramps and other types of mild to moderate pain. Ulcers and internal bleeding can occur without warning from use of this drug. Common side effects may include abdominal pain, bruising, constipation, difficult or labored breathing, dizziness, drowsiness, headache, heartburn, itching, nausea, ringing in ears, skin eruptions, and swelling due to fluid retention. *Naprosyn, available at* http://www.healthsq-uare.com/newrx/nap1283.HTM (last visited May 20, 2004).

8. Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute painful musculoskeletal conditions. Improvement is manifested by relief of muscle spasm and its associated signs and symptoms, namely, pain, tenderness, limitation of motion, and restriction in activities of daily living. Flexeril may impair mental and/or physical abilities required for performance of hazardous tasks. Flexeril may enhance the effects of alcohol, barbiturates, and other CNS depressants. The most frequently reported adverse reactions are drowsiness, dry mouth, and dizziness. *Physicians' Desk Reference*, (Medical Economics Company, Inc., Inc. 56rd ed 2002). [hereinafter PDR].

9. Antihistamine. *Physicians' Desk Reference*, (Medical Economics Company, Inc., Inc. 56rd ed 2002). [hereinafter PDR].

Significant for weakness, night sweats, dizziness, blurred vision, ringing in ears, neck pain with decreased range of motion, irregular heartbeat, ankle swelling, numbness and tingling in bilateral arms and legs and easy bruising.

On the Oswestry Questionnaire pain was rated at 9. Pain drawings appear in the record. The drawings note pain over neck and low back area with radiation down spine and down both arms and legs.

On the physical examination Dr. Pirofsky noted "grossly decreased" sensation to pin prick in the bilateral hands—otherwise intact; decreased range of motion in cervical spine: 45 of flexion, 20 of extension, right lateral flexion at 45 , left lateral flexion at 45 , left rotation at 45 , and right rotation at 75 . Range of motion in the lumbar spine was decreased: ROM with 90 flexion, 30 extension, bilateral lateral flexion and bilateral lateral flexion, bilateral rotation. Shoulder range of motion was decreased: bilateral 180 of abduction and forward elevation with 40 of internal rotation and 90 of external rotation. The doctor's impression was bilateral carpal tunnel release, status post cervical fusion C5–6, cervical radiculopathy,[10] and lumbar radiculopathy [11] of unknown origin.

█ In light of Dr. Pirofsky's entire evaluation the last sentence certainly does not mean plaintiff had improved and was no longer disabled. It means he was surprised she was doing as well as she was

with all her medical problems. It is difficult for the court to follow how the Administration could have reached such an erroneous conclusion based on the Pirofsky evaluation had the entire evaluation been read. Plaintiff had been granted disability status in 1994 based on pain. Plaintiff continued to have pain. Objective signs were present: reduced range of motion, decreased sensation, weakness, swelling of ankles—objective signs fulfilling the requirements of the Eleventh Circuit pain standard which requires the following:

1. evidence of an underlying medical condition and either

2. objective medical evidence confirming the severity of the alleged pain arising from that condition or

3. that the objectively determined medical condition is of such severity that it can reasonably be expected to cause the alleged pain.

*Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir.1991). See also *Elam v. Railroad Retirement Board,* 921 F.2d 1210, 1215 (11th Cir.1991); *Lamb v. Bowen,* 847 F.2d 698, 702 (11th Cir.1988); *Hand v. Heckler,* 761 F.2d 1545, 1548 (11th Cir.1985).

More recently, in *Wilson v. Barnhart,* 284 F.3d 1219, 1225 (11th Cir.2002), the court announced the pain standard as follows:

> In order to establish a disability based on testimony of pain and other symp-

---

**10.** Cervical radiculopathy is irritation or pinching of a nerve in the neck that causes pain down to the shoulder, arm or hand. If the neck nerves are inflamed or compressed, pain and/or weakness can occur. Disk herniation (slipping out of place) and arthritic spurs in the neck are the most common causes of cervical radiculopathy. Injuries to the neck can also cause this disorder and are potentially very serious. Gerald A/ Malanga, MD, *Cervical Radiculopathy,* at: http://www.emedx.com/emedx/diagnosis _information/shoulder_disorders/cerevical_radiculo...(visited July 8, 2004).

**11.** One of the major causes of acute and chronic low back pain is radiculopathy. Lumbosacral radiculopathy results from nerve root impingement and/or inflammation that has progressed enough to cause development of neurologic symptoms in the areas supplied by the affected nerve roots. Gerard A. Malanga, MD, *Lumbosacral Radiculopathy,* at: http://www.emedicine.com/sports/topic66.htm (last modified June 28, 2004).

toms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

In *Brown v. Sullivan*, 921 F.2d 1233 (11th Cir.1991), the court said:

> The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987); *MacGregor*, 786 F.2d at 1054; *Landry [v. Heckler]*, 782 F.2d [1551] at 1552 [(11th Cir.1986)]. If the Secretary decides not to credit such testimony, he must discredit it explicitly, *MacGregor [v. Bowen*, 786 F.2d 1050] at 1054 [(11th Cir.1986)], and articulate explicit and adequate reasons for doing so. *Hale*, 831 F.2d at 1011. Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir.1988); *Hale*, at 1011; *MacGregor*, at 1054.

*Brown v. Sullivan*, 921 F.2d at 1236.

Nothing in the record documents an improvement in plaintiff's condition. Physicians' Assistant[12] Benjamin Dale, working under the supervision of the doctors at Cooper Green Hospital and representative of the treating team[13] there, completed a "Physical Capacities Evaluation" on claimant May 16, 2001. He opined she could lift 10 pounds occasionally. She could sit four hours during an eight-hour workday and sit/stand (combined) two hours during the same time period. She could occasionally perform push/pull movements; occasionally perform gross manipulation and fine manipulation; occasionally bend, stoop, and reach. She could never climb and balance. She was unable to work around hazardous machinery. On the "Clinical Assessment of Pain" form Dale opined plaintiff's pain was present to such an extent as to be distracting to adequate performance of daily activities or work. Physical activity would increase the pain to such an extent as to cause distraction from or total abandonment of tasks. Some of the side effects of her medication could create serious problems.

By letter of May 16, 2001, addressed to plaintiff's attorney, Mr. Dale concluded his letter with the following statement:

> In conclusion, Ms. Brown has chronic pain due to the above complaints (listed in earlier paragraph) and is presently unable to work. She continues to have little or no relief with muscle relaxers and pain medication; however, she continues to be followed in the Orthopedic and Medical Clinics....

Treating notes from Cooper Green Hospital on July 21, 2000, indicate Ms. Brown

---

**12.** See 20 CFR § 404.1513(d)(1). Which reads as follows:

> (d) *Other sources.* In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to—
>
> (1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists):

**13.** Treating notes from Cooper Green show Mr. Dale's name dating alongside that of treating physicians dating back to 1995, long before her disability status was discontinued. His longstanding involvement with her treatment continued during the period in question.

was waking up with pain in her fingers and both hands. She complained of arthritis pain on March 14, 2001, as well as left hand lipoma.[14] Her history of obesity and no weight loss was documented. She was re-diagnosed with carpal tunnel on April 11, 2001, when there was left hand and metacarpophalangeal [MCP] swelling.[1516] Degenerative joint disease was noted April 11, 2001.

ALJ Munford places a great deal of credence on the consultative examination of Dr. Bruce Romeo who examined plaintiff November 6, 2000. Significant, egregious omissions from the ALJ's decision are the findings in Dr. Romeo's radiological evaluation (x-ray of lumbosacral spine) showing osteophytic lipping of the anterior bodies and narrowing of the L5–S1 disk space.

■ Plaintiff, age 52 at the time benefits were terminated, was due benefits under 20 CFR, Ch. III, Pt. 404, Subpt. P, App. 2, Rule 201.04, TABLE No. 1—Residual Functional Capacity: Maximum Sustained Work Capability Limited to Sedentary Work As A Result OF Severe Medically Determinable Impairments. She met the disabled criteria by being 50 + years old with a high school education and no transferable skills.[17] Within days of the ALJ's August 29, 2001, decision Ms. Brown was determined disabled September 1, 2001. At all times during the time in question, July 1998 and August 2001, plaintiff's medical vocational profile matched the requirements of Rule 201.14.

In his findings the ALJ failed to consider **obesity,** recognized as a secondary diagnosis in the initial Continuing Disability Review. In the report of medical evaluation performed by OccuMatrix Health Clinic November 6, 2000, based on a physical examination, plaintiff weighed 196 pounds. She was 5' 3½" tall. Her "Body Mass Index" [hereinafter BMI][18] was

---

**14.** Lipoma is a common soft-tissue tumor found under the skin but it can also appear in deeper tissues and even in various body organs such as the heart, brain, and lung. It can vary from the size of a walnut to that of a large baseball and usually has a soft, rubbery feel. Symptoms include soft, moveable lumps under the skin that are sometimes painful to the touch. The doctor may make a diagnosis based on a visual examination of the patient and may perform a biopsy on the lesion to determine the type of lipoma. Types include the superficial subcutaneous lipoma, the intramuscular lipoma, the spindle cell lipoma, the angiolipoma, the benign lipoblastoma, and the lipomas of tendon sheaths, nerves, synovium, periosteum, and the lumbosacral area. The most common type is the superficial subcutaneous lipoma. *A to Z health and disease information,* at http://www.hmc.psu.edu/healthinfo/jkl/lipoma.htm (visited July 10, 2004).

**15.** The MCP *joints are the knuckles of the* hand. They are capable of flexion (bending) and extension (straightening), abduction (spreading of the fingers), and abduction (bringing the fingers together). *Hand and Wrist,* at http://www.chionline.com/anatomy/anat4.html (visited July 10, 2004).

**16.** Plaintiff's hand was noted to be about 3 mm larger.

**17.** Although the ALJ stated in his opinion plaintiff had some transferable skills, this was not proven by the vocational expert or any other record source and he made no finding to that effect. The vocational expert testified Ms. Brown had no transferable skills.

**18.** BMI is a measurement of body fat based on height and weight. It applies to both adult men and women. The National Institutes of Health [NIH] established medical criteria for the diagnosis of obesity in its Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98–4083, September 1998). These guidelines classify overweight and obesity in adults according to Body Mass Index. Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. SSR 02–1P.

34.25. A BMI of 30 or greater equals **obesity.** Policy Interpretation Ruling, Titles II and XVI: Evaluation of Obesity, SSR 02–01P was issued September 12, 2002, to provide guidance on the SSA policy concerning the evaluation of obesity in disability claims filed under titles II and XVI of the Social Security Act. Although Listing 9.09 (Obesity) was deleted from the Listings effective October 25, 1999, changes were made to the Listings to ensure obesity was still addressed. Paragraphs were added providing guidance about the potential effects obesity has in causing or contributing to impairments in the musculoskeletal, respiratory, and cardiovascular body systems. The policy interpretation defines obesity as a "complex, chronic disease characterized by excessive accumulation of body fat." The Ruling recognizes obesity can cause limitations in all exertional and postural functions. It recognizes that obesity makes it harder for the chest and lungs to expand. Obesity forces the respiratory system to work harder to provide oxygen to the body, in turn making the heart work harder to pump blood and carry oxygen to the body. The Ruling recognizes obesity can increase the severity of coexisting or related impairments, including musculoskeletal disorders. Of significance is the fact that ALJ Munford included cervical degenerative disc disease as a severe impairment but did not consider it in combination with obesity or any other condition.[19] Plaintiff has degenerative disc disease. She has discogenic and degenerative disorders of the back.

"The function of a reviewing court is limited to determining whether the Secretary's findings are supported by substantial evidence considering the evidence as a whole." *Mims v. Califano,* 581 F.2d 1211, 1213 (5th Cir.1978). "Substantial evidence is more than a scintilla, but less than a preponderance." *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983). It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842, 852 (1971). The court is still responsible for scrutinizing " 'the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding.' " *Boyd v. Heckler,* 704 F.2d 1207, 1209 (11th Cir.1983) (quoting *Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir.1982)). The Eleventh Circuit has gone on to state the following:

> Our limited review does not, however, mean automatic affirmance, for although we defer to both the Secretary's factfinding and her policy judgments, we must still make certain that she has exercised reasoned decision making. To this end, we evaluate the Secretary's findings in light of the entire record, not only that evidence which supports her position.

*Owens v. Heckler,* 748 F.2d 1511 (11th Cir.1984).

The court must further consider whether the decision of the Commissioner

---

**19.** See *Davis v. Shalala,* 985 F.2d 528, 534 (11th Cir.1993) ("This court has repeatedly held that an ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled;") *Lucas v. Sullivan,* 918 F.2d 1567, 1573–74 (11th Cir.1990) (The combination of all impairments must be evaluated with respect to the effect they have on plaintiff's ability to fulfill the duties of past relevant work or other work); *Swindle v. Sullivan,* 914 F.2d 222, 226 (11th Cir.1990) ("In evaluating a claimant's residual functional capacity, the ALJ must consider a claimant's impairments in combination;") *Walker v. Bowen,* 826 F.2d 996, 1001 (11th Cir.1987) (When there are a multitude of impairments a claim for Social Security may lie even though none of the impairments considered individually is disabling.)

contains a material error of law. In *Walker v. Bowen,* 826 F.2d 996, 999 (11th Cir. 1987), the court held:

> Despite this limited review, we scrutinize the record in its entirety to determine the reasonableness of the secretary's factual findings. *Bridges,* 815 F.2d at 624; *Arnold v. Heckler,* 732 F.2d 881, 883 (11th Cir.1984). No similar presumption of validity attaches to the Secretary's legal conclusions, including determination of the proper standards to be applied in evaluating claims. *Wiggins v. Schweiker,* 679 F.2d 1387, 1389 (11th Cir.1982).

Having evaluated the evidence, the court holds that substantial evidence does not support the decision denying disability benefits. Improper legal standards were applied. 1) There was no evidence plaintiff ever had an improvement in her medical condition. Absent improvement, the condition and resulting pain always existed. 2) By ignoring the substantive material from Dr. Pirofsky's examination the Administration reached an erroneous conclusion of medical improvement. 3) The ALJ ignored the symptoms Dr. Pirofsky found and the findings he reached. 4) The ALJ ignored the initial diagnosis ("Disorders of back (discogenic and degenerative)") and secondary diagnosis (obesity and other hyperalimentation), omitted them from his list of severe impairments, and failed to take the diagnoses into consideration in reaching his decision. 5) The ALJ ignored the testimony of Vocational Expert Guthrie that plaintiff has no transferable skills. 6) The ALJ made no finding that plaintiff has transferable skills, but alluded to transferable skills in his opinion. 7) The ALJ failed to give proper weight to the opinion of Benjamin Dale, P.A., as provided in 20 CFR § 404.1513(d)(1). 8) The ALJ ignored the opinion of Dale that plaintiff is disabled due to chronic pain. 9) The ALJ ignored the records from Cooper Green Hospital. 10) The ALJ failed to consider the findings in Dr. Romeo's radiological evaluation. 11) The ALJ failed to find plaintiff qualified for disability under 20 CFR Ch. III, Subpt. P, App. 2, Rule 201.04 based on her medical vocational profile. 12) The ALJ ignored SSR 02–01P allowing for the effects obesity has in causing or contributing to impairments of the body. 13) The ALJ failed to make a finding of obesity. 14) The ALJ failed to consider obesity in combination with plaintiff's other impairments.

Based on the above the court HOLDS that plaintiff was disabled during the period of July 1998 to August 29, 2001. The decision of the Commissioner denying benefits to her during that period of time is REVERSED. An order consistent with this opinion is being entered contemporaneously herewith.

### FINAL ORDER

In conformity with and pursuant to the memorandum opinion entered contemporaneously, it is

ORDERED, ADJUDGED and DECREED that the decision of the Commissioner of Social Security be and it hereby is REVERSED, and the case is REMANDED to the Commissioner with instructions that the plaintiff be granted the benefits claimed.

It is FURTHER ORDERED that the Commissioner withhold from payments which he may determine are due plaintiff under this order an amount not to exceed 25 percent of the total amount of disability benefits to which the plaintiff is entitled, pursuant to the provisions of section 206 of the Social Security Act, as amended 42 U.S.C. § 406(b). The Commissioner is directed to advise the court of the amount withheld so that the matter may be set for final determination of the amount of attorney's fees to be allowed plaintiff's counsel

for services rendered in representing the plaintiff in this cause.

It is FURTHER ORDERED that pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, that plaintiff's attorney is hereby GRANTED an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b) until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. *This order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.*