Shernita LUCAS, Plaintiff–Appellant,

v.

Louis W. SULLIVAN, Secretary of the U.S. Dept. of Health & Human Services, Defendant–Appellee.

No. 89–8697.

United States Court of Appeals, Eleventh Circuit.

Dec. 14, 1990.

Denise Marshall, Albany, Ga., Phyllis J. Holmen, Georgia Legal Services Program, Atlanta, Ga., Rachael G. Henderson, Georgia Legal Services Program, Waycross, Ga., for plaintiff-appellant.

Michael Daniel, Asst. U.S. Atty., Macon, Ga., for defendant-appellee.

Before CLARK, Circuit Judge, MORGAN and HILL *, Senior Circuit Judges.

CLARK, Circuit Judge:

Appellant Shernita Lucas appeals the district court's affirmance of the decision by an Administrative Law Judge (ALJ) denying her claim for Supplemental Security Income benefits. We reverse the district court's order and remand this case to the Secretary because we find that the Secretary failed to fully and fairly develop the record, failed to fully consider the combination of her impairments, and failed to evaluate certain testimony.

## BACKGROUND

At the time of the hearing before the ALJ in December 1987, Ms. Lucas was 29 years old. She completed school through the tenth grade, but her reading skills are at the fourth or fifth grade level and her math skills are at a fifth or sixth grade level. Her past relevant work history includes work as a hotel maid and a teacher's aide. Ms. Lucas testified at the hearing that she was fired from her previous job because of seizures, but the record also indicates that she was fired from her job as a teacher's aide because of interpersonal differences with parents. She testified that she has had 26 or 27 seizures in the last three months and had not missed a dosage of medicine in the last six months. She also testified that she stopped drinking alcohol the preceding year. Ms. Lucas's neighbor and friend testified that Ms. Lucas had a minimum of four seizures a week; and one week, she had 30 seizures.

The record reveals the following about Ms. Lucas's lengthy and complicated medical and psychological history as it relates to her various impairments. Because her family does not have a history of epilepsy

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

or other seizure disorders, the apparent cause of Ms. Lucas's seizure disorder is a cerebral injury caused by a blow to her head when she was sixteen years old. Dr. John Scott, a neurologist, was the first physician of record to treat Ms. Lucas. On April 9, 1981, he performed an electroencephalogram (EEG) on her which revealed a low amplitude left temporal and right frontal spike discharge when Ms. Lucas was asleep. Dr. Scott prescribed Dilantin to control her seizures.

Five months later, Ms. Lucas was admitted to Orlando Regional Medical Center because she was exhibiting inappropriate and bizarre behavior. She was released and then readmitted two days later in an acute psychotic state accompanied by auditory hallucinations, religious preoccupations, paranoid delusions, and impaired judgment. The treating physician, Dr. Ansley, reported that her condition possibly could have been brought on by acute alcohol intoxication, that her Dilantin level was below therapeutic range, and that she had not been taking her Dilantin as recommended. Between March 10, 1981 and July 14, 1981, Ms. Lucas was treated as an outpatient at Southwest Community Mental Health Center, where she was also referred to the Epilepsy Society for assistance. During this time, she complained of nervousness, feelings of paranoia, auditory hallucinations, confusion, symptoms of depression, and blackouts. Her treating therapist indicated that her emotional problems were secondary to her neurological disorder. The epilepsy research lab also reported her Dilantin and Phenobarbital levels below therapeutic range in July 1982 and March 1983.

In June of 1982, Dr. Gutman, a consulting psychiatrist, examined Ms. Lucas and found that she "had a slight paranoia about her," but that she would be able to do simple repetitive tasks under ordinary supervision and respond appropriately to supervisors and co-workers. In April, October, and December of 1983, and January 1984, Ms. Lucas was treated in the Orlando Regional Medical Center emergency room. On all four occasions, she was treated for seizures, abdominal pain and schizophrenic

behavior, and on the April 1983 admission, her Dilantin and Phenobarbital levels were below therapeutic range.

In 1984, Ms. Lucas returned to her hometown of Albany, Georgia. At the request of the Secretary, she was examined by Dr. Long, a psychologist. He diagnosed her as having adjustment reaction with mixed emotions and borderline intellectual functioning, with a full scale IQ of 76. He reported indications that Ms. Lucas exhibits wide swings in mood, low level of psychological energy, tends to give up quickly, and has problems in expressing herself effectively. He noted that she was quite limited in terms of general fact comprehension because of cultural deprivation. He reported that she admitted drinking alcohol in the past, but denied drinking in recent months. He also indicated that she reported having constant headaches. He concluded that she had "sufficient capacity to function in specific work areas," but that her seizures would be an interfering factor, especially at the frequency she was reporting (4–5 times/day).

Dr. Martin, a consulting family practitioner, examined Ms. Lucas on December 28, 1984. He reported that her seizure medication was below therapeutic levels, although she indicated that she took her medication as prescribed. He also noted that she admitted to occasional use of alcohol.

On February 5, 1985, Ms. Lucas made an initial visit to Dr. Parrot, a physician. While in Dr. Parrot's office, she suffered a seizure with tonic-clonic posture, tremors and drooling, and post-ictal derangement. Dr. Parrot immediately admitted her to Palmyra Park Hospital, and hospital lab tests indicated that her Dilantin level was within therapeutic range. Two days later, her serum blood level of Phenobarbital was also found to be within the therapeutic range. On February 9, 1985, Ms. Lucas was transferred to Phoebe Putney Memorial Hospital because of recurrent episodes of uncontrolled shouting and swearing, behavior characteristic of temporal lobe epilepsy. During these hospital stays, Dr. Baker, a neurologist, diagnosed Ms. Lucas

as having a complex partial seizure state, psychomotor seizure post-traumatic and behavior adjustment reaction secondary to the seizures, and possible paranoid schizophrenia. He prescribed Dilantin and Depakene for treatment of her seizures, and Mellaril for treatment of her psychological symptoms. After being released from the hospital, Ms. Lucas returned to see Dr. Baker. She informed him that she had cut back on the Mellaril because it made her drowsy all the time, which is a common side effect of Mellaril.

In October 1985, Ms. Lucas sought treatment from Dr. Poulos, who diagnosed her as having partial complex seizures and paranoid schizophrenia, and indicated that she had poor insight into her medical problems. He prescribed Dilantin, Valproic Acid and Mellaril. He reported that Ms. Lucas stated that she took her medication, but that her seizure medication levels were below therapeutic range.

Dr. Cotes, a psychiatrist, first saw Ms. Lucas on March 23, 1986. He stated that although he was not treating Ms. Lucas for her seizure disorder, he "would expect the diagnosis of Gran Mal seizures to be correct, and would expect Gran Mal seizures at the frequency she is having to exclude the possibility of holding gainful and competitive employment." He prescribed Desyrel and Tranzene to treat her psychological symptoms. In August 1986, Ms. Lucas underwent another consultative psychological examination by Dr. Powers, a clinical psychologist. He diagnosed Ms. Lucas as having Dysthymic Disorder[1] and Borderline Intellectual Functioning resulting from psychosocial deficiencies, thus confirming her previous psychological evaluations.

Ms. Lucas discontinued her treatment with Dr. Poulos, and returned to see Dr. Baker in October 1986. Dr. Baker observed that the impact of the seizure disorder on her personality was more dramatic. He described her as being aggressive and hostile, with a "chip on her shoulder," and as exhibiting paranoia. He found that her Dilantin and Valproic Acid levels suggested that she was taking her medication. He also requested that Ms. Lucas keep a calendar of her seizures, which calendar indicates that she had five seizures in July, five in August and ten in September 1986. In an effort to treat her personality disorder, Dr. Baker prescribed Lithium. On January 16, 1987, he noted that the Lithium had made a significant difference in her personality. However, when he saw her again in June 1987, she reported that she had gotten into a fight, had a seizure and had been taken to jail. He found her medication levels to be below therapeutic levels, and suggested that she may not have been taking her medication faithfully.

One month later, the police were called to investigate a disturbance at her home. Upon his arrival, the police officer saw Ms. Lucas running at him in the street with a brick in her hand. The policeman shot her in the hip, and she was admitted to Phoebe Putney Memorial Hospital. Her Dilantin level was found to be slightly above therapeutic levels upon her admission. After undergoing surgery, she was transferred to Southwestern State Hospital on August 6, 1987 for a psychiatric evaluation. Upon admission to Southwestern State, her Dilantin level was found to be below therapeutic levels. After twenty days of hospitalization, her Dilantin level remained subtherapeutic.

While at Southwestern, Dr. Lingao, a physician, treated Ms. Lucas, and reported that she admitted to some drinking, but was hesitant to elaborate on her drinking habits. She diagnosed Ms. Lucas as having a seizure disorder, mixed personality disorder, borderline intellectual functioning, and unspecified alcohol abuse. Dr. Falls, a psychologist at Southwestern, evaluated Ms. Lucas and reported that her test results were similar to those of other indi-

---

**1.** Dysthymic Disorder involves chronic disturbance of mood, manifesting itself as depression or loss of interest in all, or almost all, usual activities and pastimes. Symptoms must persist for two years, and include poor appetite or overeating, low energy level, low self-esteem, poor concentration or difficulty making decisions, feelings of hopelessness, and insomnia or hypersomnia. Diagnostic and Statistical Manual of Mental Disorders (Third Ed.–Revised), p. 230 (1987).

viduals who have problems controlling their impulses, a deficiency that results in difficulties with rules and persons who enforce rules. Dr. Falls noted that she was under the influence of alcohol at the time of their consultation, and that he felt she had a problem with alcohol abuse.

Dr. McElhaney, a psychologist, provided a consultative review of Ms. Lucas's psychological condition on September 22, 1987. He reported that she had a mixed personality disorder and that she exhibited hostility and impulsiveness, and that she had a history of alcohol abuse. He concluded that she "would not be able to interact appropriately with the general public," and that she would have difficulty accepting instructions and responding appropriately to criticism from supervisors, but that she could learn to respond appropriately if she pursued psychological treatment. He noted that she had not allowed herself to be consistently involved in psychotherapy for a significant length of time.

Dr. Allen, a "Pediatric Consultant" for Georgia Disability Adjudication, submitted a consulting report on September 21, 1987. He found that Ms. Lucas had not been under regular treatment, is noncompliant with her medications, and "drinks." He did not believe that she had seizures at the frequency she reported because during her extended hospital stay in August 1987 no seizures were reported in her records.

## DISCUSSION

In making a claim for Social Security disability benefits, a claimant bears the initial burden of establishing the existence of a disability. 42 U.S.C. § 1382c(a)(3) (1982); 20 C.F.R. § 416.912 (1989); *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir.1987). To establish the existence of a disability, the claimant must show that she has an impairment or combination of impairments that meets or exceeds the criteria in the Listing of Impairments in Appendix 1 of Subpart P of 20 C.F.R. § 404. 20 C.F.R. §§ 416.911, 419.920(c) (1989). The claimant also bears the initial burden of proving that she is unable to perform her previous work. *Cannon v. Bowen*, 858 F.2d 1541,

1544 (11th Cir.1988); *Jones v. Bowen,* 810 F.2d 1001, 1005 (11th Cir.1986).

In reviewing claims under the Social Security Act, we must find the Secretary's decision conclusive if it is supported by substantial evidence. Substantial evidence is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Cannon,* 858 F.2d at 1544 (citations omitted).

### A.   *Failure to Fully Develop the Record*

The Secretary may deny SSI disability benefits if the Secretary determines that 1) the claimant failed to follow a prescribed course of treatment, and 2) her ability to work would be restored if she had followed the treatment. *McCall v. Bowen,* 846 F.2d 1317, 1319 (11th Cir.1988); *Schnorr v. Bowen,* 816 F.2d 578, 582 (11th Cir.1987); 20 C.F.R. § 404.930 (1989). In the present case, the ALJ found that Ms. Lucas had failed to establish the existence of an impairment or combination of impairments that meets or equals any of the impairments in the Listing of Impairments. In concluding that her seizure impairment did not meet the criteria under section 11.02 or 11.03 of the Listing of Impairments, the ALJ relied on his conclusion that her seizure disorder is controllable by medication, but that she had failed to take her medications as prescribed. The ALJ provided the following explanation of his decision:

> Although claimant at various times has alleged seizures of a frequency which would meet either Listing 11.02 or 11.03, neither claimant's description of the frequency or severity of the seizures is considered entirely credible. Furthermore, there is repeated evidence of subtherapeutic serum drug levels and *there is no indication whether these are caused by an individual idiosyncrasy in the absorption or metabolism of the drug.*
>
> \*   \*   \*   \*   \*   \*
>
> Claimant's treating physicians (Exhibits 41, 70, 72) have noted statements by claimant that she is not taking her medication as prescribed as well as stating

their own beliefs that the low serum anti-convulsant levels are due to claimant not taking the medication as prescribed. Dr. John Baker, who is claimant's primary treating source for her seizures, on October 3, 1986, noted that claimant said that she stopped her seizure medications periodically on her own, and on June 9, 1987, said that claimant was probably not taking her medication faithfully.... As claimant's seizures could be expected to be under much better control were claimant to follow her prescribed treatment, claimant cannot be found to be disabled based on increased seizures due to not taking her medication as prescribed.

R2–16 (emphasis added).

The ALJ's finding that "there is evidence of intermittent noncompliance," R2–16, is clearly supported by substantial evidence in the record. As the ALJ noted, Ms. Lucas told her doctors on several occasions that she had not been taking the medications as prescribed. However, the ALJ's conclusion that her intermittent noncompliance is "a primary cause of [her] seizures," *Id.*, is not supported by substantial evidence. The ALJ himself noted that there was no indication in the record as to *whether* the subtherapeutic drug levels were caused by individual idiosyncrasy in absorption or metabolism of the drugs. Although the record contains many clinical reports of her drug blood serum levels, it contains no objective findings regarding her absorption and metabolism of the drugs. Evidence in the record indicates that such diagnostic studies were needed to fully and fairly develop the record.

On July 26, 1987, Ms. Lucas was hospitalized after being shot by a police officer while she was having a seizure. Upon her admission, her blood level for Dilantin was slightly *above* the therapeutic level. However, when she was transferred to another hospital a week and a half later, her Dilantin level was below therapeutic level. After twenty additional days of hospitalization, her Dilantin level remained subtherapeutic. Additionally, in 1985, Ms. Lucas experienced a grand mal seizure in Dr. Parrott's office at a time when her blood level for Dilantin was within therapeutic range. This evidence gives indications of idiosyncrasies in absorption and/or metabolism of her medication, and that her seizures may not be controlled by her medication. Because the Secretary may not deny SSI disability benefits on the basis of noncompliance with treatment unless it is shown that compliance would restore the claimant's ability to work, the ALJ should have ordered objective testing to determine whether factors other than Ms. Lucas's intermittent noncompliance contributed to the subtherapeutic drug levels, and whether her seizures would be controlled even if she consistently took her medication as prescribed.

Section 11.00 of the Listing of Impairments provides guidance for the determination of whether a neurological impairment is of a severity that renders a person disabled within the meaning of the Social Security Act. With respect to establishing a neurological impairment that meets the criteria of sections 11.02 and 11.03, section 11.00 provides the following:

Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed anticonvulsive treatment. Adherence to prescribed anticonvulsive therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of ... anticonvulsive drugs may serve to indicate whether the prescribed medication is being taken. When seizures are occurring at the frequency stated in 11.02 and 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels. Should serum drug levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in absorption [or] metabolism of the drug. Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance. When the reported drug levels are low, therefore, the information obtained from the treating source should

include the physician's statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels. Where adequate seizure control is obtained only with unusually large doses, the possibility of impairment resulting from the side effects of this medication must be also assessed. Where documentation shows that use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level.

20 C.F.R. Part 404, Subpart P, App. 1, Sec. 11.00 (1989). While Dr. Baker's report that Ms. Lucas told him that on occasion she stopped taking her medications indicate that she is noncompliant, evidence that she has had seizures even when her medication levels are within the therapeutic range and that her medication levels have remained below therapeutic range after several weeks of supervised medication tend to show that her noncompliance is not a primary reason for the frequency of seizures she experiences.

Furthermore, the ALJ failed to consider all the evidence in the record regarding Ms. Lucas's alcohol abuse problem, especially in relation to its effects on her ability to consistently take her prescribed medications. Although at the hearing she denied using alcohol in the previous year, Doctors Falls and Lingao both reported in July 1987, only five months before the hearing, that they felt Ms. Lucas had a problem with alcohol abuse. Moreover, in 1981 Ms. Lucas was admitted to the hospital in an acute psychotic state which the treating physician felt might have been brought on by acute alcohol intoxication. Dr. Long, who saw Ms. Lucas three years later in 1984, also reported that Ms. Lucas had a problem with alcohol abuse. In light of this evidence, it was incumbent on the ALJ to more fully develop the record with respect to the role alcohol abuse may play in precipitating her seizures or in affecting her compliance with the prescribed medication therapy. 20 C.F.R. Part 404, Subpart P, App. 1, Sec. 11.00; *Nelms v. Bowen*, 803 F.2d 1164 (11th Cir.1986) (Holding that ALJ is obligated to fully and fairly develop record); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir.1981) (same); *Ford v. Secretary of Health and Human Svcs.*, 659 F.2d 66 (5th Cir. Unit B 1981) (Holding that ALJ's findings are not supported by substantial evidence when record does not contain sufficient facts on which to make an informed decision).[2]

### B. *Failure to Consider Impairments in Combination*

Ms. Lucas also argues that the ALJ did not consider the combination of her psychological and physical impairments in determining that she did not have an impairment that meets or equals any of the impairments in the Listing of Impairments. The only evidence that indicates the ALJ considered her impairments in combination is his statement that, "Considering all of claimant's impairments in combination, the Administrative Law Judge concludes that claimant retains the residual functional capacity to perform unskilled and semi-skilled work not requiring work at unprotected heights or around dangerous moving machinery." R2–20. While the ALJ's decision reveals that he closely reviewed the record

---

**2.** Ms. Lucas raises two additional arguments regarding the ALJ's failure to fully develop the record. First, she argues that the ALJ failed to consider the possibility of impairment resulting from side effects of the large doses and many kinds of medications she takes on a daily basis. *See* 20 C.F.R. Part 404, Subpart P, App. 1, Sec. 11.00, *supra.* On remand the ALJ should develop evidence regarding the existence of any side effects resulting from her medications and any adverse interactions of those medications and the effect any such side effects and adverse interactions may have on her ability to work. *Cowart*, 662 F.2d at 737.

Second, she argues that the ALJ erred in failing to solicit testimony from a vocational expert. However, because the ALJ concluded that she is capable of performing her past relevant work, testimony from a vocational expert was not necessary. If on remand the ALJ determines that Ms. Lucas is not able to perform her past relevant work as a teacher's aide or hotel maid, use of a vocational expert may be necessary. *See Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir.1987).

regarding Ms. Lucas's psychological impairments and evidence of her borderline intellectual functioning, this one statement does not reveal how he evaluated the effect these problems may have on her ability to properly treat her seizure disorder. Because a claimant's failure to adhere to prescribed treatment cannot be grounds for denial of SSI benefits when the reason for such failure is beyond the claimant's control, the effect Ms. Lucas's psychological impairment and her borderline intellectual functioning have on her ability to treat her seizure disorder should be considered by the ALJ on remand. *See Dawkins v. Bowen*, 848 F.2d 1211, 1213–14 (11th Cir.1988) (Noncompliance does not prevent claimant from receiving benefits where noncompliance is result of inability to afford treatment); *McCall v. Bowen*, 846 F.2d 1317, 1319 (11th Cir.1988) (Absent evidence that claimant's weight was within her control, claimant's failure to lose weight upon physician's recommendation did not preclude claimant from receiving disability benefits.). Furthermore, the ALJ's failure to fully develop the record with respect to the role alcohol abuse may play in exacerbating her impairments necessarily precluded a complete analysis of the effect the combination of her impairments has on her residual functional capacity. On remand, the combination of all her impairments must also be evaluated with respect to the effect they have on her ability to fulfill the duties of her past relevant work, or other work. *Gibson v. Heckler*, 779 F.2d 619 (11th Cir. 1986); *Jones v. Bowen*, 810 F.2d 1001 (11th Cir.1986); *Hudson v. Heckler*, 755 F.2d 781 (11th Cir.1985).[3]

### C. *Failure to Properly Consider Certain Evidence*

■ Ms. Lucas argues that the ALJ improperly rejected the opinion of her treating physicians that she is totally disabled. However, a thorough reading of the ALJ's decision reveals that he gave appropriate consideration to those opinions and based his rejection of them on record evidence that contradicted those opinions. Thus, the mere fact that he rejected their opinions is not in itself grounds for reversal. Nevertheless, on remand the ALJ must reconsider those opinions in light of any additional record evidence and with respect to their evaluation of the effect the combination of Ms. Lucas's impairments has on her residual functional capacity.

■ Ms. Lucas also contends that the ALJ failed to consider the testimony of her daughter and her neighbor. His decision does not review their testimony, nor give reasons for rejecting it. On remand the ALJ should state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence, including all testimony presented at the previous hearing or any subsequent hearings. *Gibson v. Heckler*, 779 F.2d 619 (11th Cir.1986) (Requiring ALJ to state the weight accorded to each item of impairment evidence and the reasons for his decision on such evidence); *Brooks v. Sullivan*, 882 F.2d 1375 (8th Cir.1989) (Holding that the Secretary is required to consider *all* the evidence, and finding error in ALJ's failure to consider and evaluate testimony of claimant's wife and former employer as to his physical capabilities).

For the foregoing reasons, the order of the district court affirming the Secretary's denial of benefits to Ms. Lucas is VACATED, and the case is REMANDED to the Secretary for further proceedings consistent with this opinion.

---

3. We also note that the record does not contain a detailed description of the duties and responsibilities of Ms. Lucas's past relevant work as a teacher's aide and hotel maid. To support a conclusion that Ms. Lucas is able to return to her past work, the ALJ must consider all the duties of that work and evaluate her ability to perform them in spite of her impairments. *Schnorr v. Bowen*, 816 F.2d at 581 (Secretary is obligated to fully develop the record regarding the duties and responsibilities of claimant's past relevant work); *Nelms v. Bowen*, 803 F.2d 1164 (11th Cir.1986) (same).