[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13895
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cv-01011-GGB

PAUL H. OSTBORG, JR.,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(May 29, 2015)

Before HULL, ROSENBAUM and FAY, Circuit Judges.

PER CURIAM:

Paul H. Ostborg, Jr., appeals the district judge's final order affirming denial of his application for disability and disability-insurance benefits under 42 U.S.C. § 405(g) by the Social Security Administration ("SSA"). We affirm.

## I.    BACKGROUND

Ostborg, a United States military veteran, has suffered from scoliosis, flat feet, and a leg-length discrepancy for most of his life. In August 1996, Ostborg filed his first application seeking disability-insurance benefits under Title II and Part A of Title XVIII of the Social Security Act and represented his disability began on August 5, 1996. In December 1996, Ostborg suffered a head injury, when he slipped on ice and fell. On June 25, 1998, an administrative law judge ("ALJ") denied his first application ("the 1998 Decision"). Ostborg filed his second and subject application for disability benefits on September 24, 2004. He last met the insurance requirements on December 31, 2001.

A.    Medical Evidence

1.    Mental-Health Records

Dr. Fredric Rose, a neuropsychologist, evaluated Ostborg on January 15, 1998. Ostborg complained he had experienced several impairments since his 1996 accident, including periods of confusion, impaired short-term memory, fatigue, forgetting details, although he reported good recognition if cued, and language errors, when stressed or fatigued. While Ostborg was able to perform the activities

2

of daily life since his accident, it took effort, and he could no longer accomplish as much each day.  Ostborg was a musician; he reported no difficulty with the cognitive aspects of playing music since his accident.

After testing Ostborg, Dr. Rose concluded he showed slowed-information-processing speed and difficulty processing information on the first exposure, but substantial improvement in recall and retention after subsequent exposures.  He opined Ostborg needed extended time and repetition to process new material, but Ostborg could complete basic and complex tasks, if given sufficient time and structure.

Nearly eight months after Dr. Rose's evaluation, Ostborg asked if he was "willing to write a note saying [he] can't work."  R. at 319.  Dr. Rose wrote the requested letter, but instead of stating Ostborg could not work, he summarized his findings concerning Ostborg's limitations as follows:

> Day to day functioning, therefore, may be affected in part by this difficulty in processing and encoding even "automatic" events such as preparing to go out for the day.  Extra time to plan and organize what must be done is now more of a necessity than in the past.  Given sufficient time and structure, however, there was no evidence from this evaluation that you would be unable to complete basic or even complex tasks.  Cognition and intelligence were otherwise sufficiently intact to allow the performance of most, if not all, tasks previously completed, though at a slowed pace requiring additional structure and time.

R. at 318-19.

3

On January 21 and February 2, 1998, Ostborg additionally was evaluated by Dr. John Stuart Currie, also a neuropsychologist. Ostborg complained to Dr. Currie of short-term-memory problems, lack of concentration, and becoming fatigued quickly. Ostborg completed an IQ test and performed below expectations, considering his education. But Dr. Currie attributed this to factors other than a natural deficit, including Ostborg's taking Vicodin. Dr. Currie also noted Ostborg showed confidence in driving, homemaking, exercising, and musical performance.

Ostborg's next mental-health treatment occurred after December 31, 2001, the last date he was insured. He obtained psychological and psychiatric treatment in October 2002, as well as in 2005, 2009 and 2010. Records of these later treatments discuss his history with his impaired memory, concentration, and information-processing speed.

2.    Physical-Health Records

In July 1997, Ostborg's primary-care physician, Dr. Charles Demosthenes, noted Ostborg's scoliosis had worsened and caused him severe pain. Dr. Demosthenes also discussed Ostborg's leg-length discrepancy and explained other doctors' reports of the extent of the discrepancy had varied. In September 1997, Dr. Demosthenes referred Ostborg for corrective shoes.

In an October 2001 annual examination, Ostborg reported chronic pain of an unspecified degree in his neck, back, and extremities. He also reported some

4

musculoskeletal pain, but it was controlled with chiropractic treatments and swimming. He complained of two skin lesions and tightness on his left side after swimming. According to a July 2004 treatment note, Ostborg stated he never drank alcohol. In a June 2005 psychiatric general progress note, however, Ostborg reported he had stopped abusing alcohol in 1969, after being discharged from the military.

Ostborg has received regular chiropractic treatment from 1990; records from that treatment generally indicate he suffers from lower back pain, neck spasms, and stiff, restricted joint movement. In August 2000, chiropractor Richard Franks wrote a letter in support of Ostborg's claim for disability benefits from the Veteran's Administration ("VA") and explained corrective shoes helped to compensate for Ostborg's leg-length discrepancy.

B.    Work History

From 1975 through 1994, Ostborg worked for up to 32 hours per week as a house manager at Grady Memorial Hospital. He assisted in the relocation of students and interns, helped assure smooth operation of house management, monitored security, and sometimes typed letters. Ostborg sat for approximately six to eight hours per day; he had to walk, stand, and climb stairs occasionally; he did not lift anything weighing more than ten pounds.

5

From 1994 through 1996, Ostborg worked as a security guard. He maintained basic order and safety of the premises and wrote some reports. He sat most of the time, walked and climbed stairs occasionally; he never lifted anything in excess of ten pounds. He also had to undergo first-aid and CPR training for that position. Neither of these jobs required technical knowledge; he did not supervise, hire, or fire employees in either position.

C.    1998 ALJ Decision

The 1998 ALJ Decision states Ostborg had represented he was disabled because of  scoliosis, pes planus (flat feet), and leg-length discrepancy in his previous application for disability benefits. He also had testified about the limiting effects of his December 1996 fall. The ALJ concluded Ostborg's testimony concerning his impairments was incredible in view of the medical evidence and his description of his activities and lifestyle. The ALJ also discussed various medical records, including Dr. Currie's evaluation, which identified no significant memory or cognitive dysfunctions. The ALJ concluded Ostborg had no more than minimal-mental impairments to work-related functioning, and he retained the residual functional capacity ("RFC") to perform medium work.

D.     VA Disability Determination

On January 16, 1999, the VA determined Ostborg was disabled.[1]  The VA decision lists Ostborg's disabilities as degenerative-disc disease of the cervical and lumbar spines, dextroscoliosis of the lumbar spine, degenerative changes of the thoracic spine, residuals from a head injury, and leg-length discrepancy.

Medical findings of various doctors are summarized in the decision, including the opinion of Dr. Lee Jacobs that Ostborg could work a desk job for not more than four hours a day.  The rating decision also briefly summarized a December 21, 1996, report from Cobb Hospital and Medical Center concerning Ostborg's accident and stated Ostborg had suffered trauma to the back of his head.

The VA determined Ostborg did not meet the schedular-requirements disability.[2]  The VA rated his disabilities as (1) 20% for degenerative-disc disease of the lumbar spine with dextroscoliosis, (2) 10% for his leg-length discrepancy, (3) 10% for degenerative-disc disease and osteoarthritis of the cervical spine, (4) 10% for degenerative changes of the thoracic spine, and (5) 10% for residuals from a concussion.  Nevertheless, the VA determined that "an extraschedular permanent and total disability rating [was] authorized," based on Ostborg's "level

---

[1]  The rating decision in the record is undated; however, the exhibit list states the decision was issued on January 16, 1999.  Additionally, a duplicate-partial copy of the VA rating decision has the same date handwritten on one of the pages.

[2]  The schedular requirements are (1) a single disability ratable at 60% or more, or (2) two or more disabilities combining to 70% with at least one ratable at 40%.

of disability and other factors, such as [his] age, education and occupational background." R. at 192.

E.       2008 ALJ Decision and Remand by the Appeals Council

1.       2008 Hearing

On May 28, 2008, at a hearing concerning Ostborg's subject application for disability benefits, Ostborg testified that, as a security guard, he sometimes worked full-time and sometimes part-time, depending on what was available and what he could handle. He characterized his job as a house manager as a "desk job" that involved admitting people to the residence halls.

Ostborg testified his grip was fair. He experienced difficulty walking, bending over, climbing stairs, and lifting anything over ten pounds. He became fatigued frequently and needed to lie down several times per day. He had experienced some improvement in his memory in the seven years following his 1996 fall, but none thereafter.

Immediately following Ostborg's 1996 fall, he was in a great deal of pain; he could not drive and had difficulty concentrating. In the past three years, however, he had driven from Atlanta, Georgia, to Asheville, North Carolina, to visit his sister. Ostborg lived alone, shopped for himself, and attended church. He also exercised regularly, by swimming two to three times a week for about 30 minutes, doing aerobics, and walking. At one time, Ostborg had freelanced as a

violin player, but he could no longer play well because of arthrosis, a degenerative-joint disease, in his hands.

Ostborg had volunteered at his church periodically for the past year and a half by sitting at the front desk for about 45 minutes to greet people and make sure they knew where they were going. For the past three years, he has volunteered at a museum in Smyrna, Georgia once per week, which also involved greeting people, asking them to sign in, and showing them around. Asked why he could not perform his previous job in security in view of his exercise and volunteer activities, Ostborg responded he volunteered only on a limited basis; his other activities were low stress and did not require him to be on his feet or to remember anything.

The following exchange occurred between the ALJ and Ostborg:

> ALJ:    I mean it's kind of hard to imagine that you don't have to concentrate at the museum job and the church job. I mean you kind of know a lot of stuff and where to send people, and you have to know your way around.
>
>            . . . .
>
>            Wouldn't that be similar to what you had to do at the hospital [or] when you were doing the security work?
>
> OSTBORG: Well, in a way, but at the hospital I had a lot more to deal with. A lot more people to, a lot more people coming in, just a lot more to do.

9

R. at 755-56.

2.    2008 ALJ Decision and Remand by the Appeals Council

In September 2008, the ALJ issued a decision denying Ostborg's claim for disability benefits. The ALJ mentioned Ostborg had sought and been awarded disability benefits by the VA but did not discuss further the VA's disability rating. Additionally, the ALJ found Ostborg's testimony concerning his limitations to be incredible because, in the hearing, he described only minimal volunteer work, but a Google search of Ostborg revealed a much wider array of activities.

Ostborg sought review from the Appeals Council ("AC"). The AC remanded the case to the ALJ. The AC concluded the ALJ had failed to provide Ostborg with the post-hearing evidence obtained from the internet and to discuss adequately the VA's disability rating or indicate the weight that the VA's determination was accorded.

F.    Post-Remand Proceedings

1.    2010 Hearing

At a hearing in November 2010, the ALJ provided Ostborg and his counsel with printouts from the ALJ's Google search; Ostborg provided additional testimony concerning his hobbies and volunteer activities. In August 2008, following the 2008 hearing, but before the ALJ's 2008 decision, Ostborg had presented two sessions on veterans benefits at Life University, which involved

10

standing and teaching for approximately an hour each time.  Ostborg's original art work was displayed at an exhibition at the Smyrna Library Gallery for about two months.  Approximately 8 to 10 drawings and paintings, which Ostborg had produced over the past forty years, were on display.  While Ostborg did not need to be present during the exhibition, he went approximately once a week to check in.

Ostborg further testified he had taken numerous pictures of houses and properties for the Smyrna Historical and Genealogical Society ("SHGS") in 2006.  He did so approximately once a month for three years.  Additionally, Ostborg volunteered at the SHGS museum three Saturdays per month, which involved remaining at a desk, assisting people as needed, and answering questions.  He was a member of the Cobb County Stamp Club.  He attended meetings, which occurred twice a month, and volunteered at shows periodically.

Ostborg had given violin and viola instruction privately in the past, but he had not done so for at least the past five years.  When he last taught violin, Ostborg had one student, with whom he met once a week for approximately one year.  Although Ostborg was listed on the roster of private violin instructors for a middle school in Georgia, he did not know how his name came to be on that list.  Ostborg was asked again why he could not have used his mind to work instead of to volunteer; Ostborg responded he volunteered only occasionally, and he could pursue his volunteer and other activities as he was inclined.

11

2.    2011 ALJ Decision and Request for Review

Although Ostborg represented his disability began on August 5, 1996, the ALJ concluded the June 25, 1998, denial of his previous application had the effect of administrative res judicata.  Consequently, the relevant period began on June 26, 1998.  The ALJ followed the five-step sequential process in evaluating Ostborg's disability claim.[3]  At step two, the ALJ found Ostborg had the severe impairments of scoliosis, leg-length discrepancy, and residuals from a 1996 closed-head injury. In evaluating the effects from Ostborg's 1996 fall and head injury, the ALJ discussed Dr. Rose's findings and letter at length.  In the analysis at step three, the ALJ acknowledged Ostborg had exhibited deficits on medical examinations with regard to concentration, persistence, or pace, but found he was only mildly impaired, because he was able to drive long distances and navigate to new areas successfully.  At step four, the ALJ found Ostborg capable of performing only light work, because of his leg-length discrepancy.  Because of his lapses in concentration, the ALJ also determined he could work up to 32 hours per week.

---

[3]  Under the five-step sequential process to determine whether a claimant is disabled, the claimant must show (1) he is not currently engaged in substantial gainful activity; (2) he has a severe impairment; (3) his impairment meets or equals the criteria in one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (4) his impairment prevents him from performing his past relevant work.  20 C.F.R. § 404.1520(a)(4)(i)-(iv).  If the claimant shows he cannot perform his past relevant work, then, at the fifth step, the burden shifts to the Commissioner to show significant numbers of jobs exist in the national economy the claimant can perform.  *Id.* § 404.1520(a)(4)(v).

The ALJ found Ostborg's medically determinable impairments could reasonably be expected to produce his alleged symptoms but decided his testimony regarding the intensity, persistence, and limiting effects of those symptoms to be incredible. The ALJ explained Ostborg was engaged in a far wider variety of hobbies and activities than he originally had represented. While these hobbies and activities did not directly contradict his allegations of disability, the ALJ found they were sufficiently inconsistent with his stated mental limitations and did not support his overall credibility. The ALJ noted various inconsistent statements Ostborg had made elsewhere in the record, including the discrepancy in his statements to his doctors concerning his alcohol consumption. Additionally, the ALJ highlighted Ostborg's testimony he could not direct his energies toward work, in view of his volunteer and other activities, because he volunteered only randomly and pursued his hobbies, when he was so inclined. The ALJ also found the VA's disability determination had "little bearing" on Ostborg's claim for Social Security disability benefits, because the VA used a different standard to assess disability and may not have been aware of his hobbies and activities. R. at 41.

Ostborg again requested AC review of the ALJ's decision. This time, the AC denied review and adopted the ALJ's decision as the final decision of the Commissioner. Through counsel, Ostborg has appealed that decision to this court.

## II.    DISCUSSION

As an initial matter, the government states the relevant time period of disability for Ostborg's case began on June 26, 1998, because the 1998 Decision had the effect of administrative res judicata.  Ostborg does not discuss this issue in his initial brief.  In his reply brief, he asserts (1) the ALJ actually considered the relevant period to have begun on August 28, 1996, despite the purported application of administrative res judicata; and (2) the application of administrative res judicata is immaterial to his arguments on appeal.

"[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."  *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).  Abandonment can occur when an appellant makes only passing reference to the claim.  *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681-82 (11th Cir. 2014).  Moreover, we will not address arguments made for the first time in a reply brief.  *Id.* at 682-83.

Because Ostborg did not raise the issue of administrative res judicata in his initial brief, he has abandoned it.  *Access Now, Inc.*, 385 F.3d at 1330.  His mention of the issue in his reply brief is both belated and insufficient to raise an argument of error, because (1) he first raises it in his reply brief, and (2) in the two sentences where he discusses the issue, he maintains the application of res judicata was

14

immaterial or the ALJ did not actually apply it, not that the ALJ erred in applying it. *Sapuppo*, 739 F.3d at 681-83.  Accordingly, we deem this issue abandoned. Our subsequent discussion clarifies Ostborg has not shown  reversal is warranted, even if the ALJ implicitly determined he was not disabled prior to June 26, 1998.

A.          <u>ALJ Gave Sufficient Weight to VA's Rating Decision</u>

Ostborg argues the ALJ failed to accord the VA's rating decision sufficient weight and provided an inadequate explanation for the determination the VA's decision had little bearing on Ostborg's claim for Social Security disability insurance benefits.  He also argues the ALJ discussed the medical evidence that was provided in support of and summarized in the VA's decision.

We review the ALJ's decision for substantial evidence but his application of legal principles de novo.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  The SSA regulations provide a decision by any nongovernmental or governmental agency concerning whether an individual is disabled, based on that agency's own rules, does not constitute an SSA decision regarding whether that individual is disabled.  20 C.F.R. § 404.1504.  A VA rating, while not binding on the SSA, "is evidence that should be considered and is entitled to great weight." *Brady v. Heckler*, 724 F.2d 914, 921 (11th Cir. 1984) (internal quotation marks omitted); *see also Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir. Unit A Mar. 1981).

For Social Security purposes, a claimant is entitled to disability insurance benefits, when he proves he is under a disability, meaning he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(a)(1)(E), (d)(1)(A). In contrast, the VA generally will grant total disability, when "there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation." 38 C.F.R. § 3.340(a)(1). Additionally, the VA "shall give the benefit of the doubt to the claimant," whenever "there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter." 38 U.S.C. § 5107.

In *Brady*, the claimant received a 100% disability rating from the VA, but the ALJ concluded the claimant did not have a severe impairment. *Brady*, 724 F.2d at 917. Based on the medical evidence, we concluded the claimant had a severe impairment and remanded for the ALJ to consider whether his impairments precluded him from performing his past work. *Id.* at 921. In *Rodriguez*, we concluded the ALJ should have "more closely scrutinized" the VA's disability rating of 100% for the claimant, where the ALJ mentioned the rating but "obviously refused to give it much weight." *Rodriguez*, 640 F.2d at 686.

The record in this case shows the ALJ closely scrutinized the VA's disability decision and gave specific reasons for determining the VA's determination had

16

little bearing on Ostborg's case. *See Brady*, 724 F.2d at 917; *Rodriguez*, 640 F.2d at 686. Substantial evidence supports the ALJ's reasons for discounting the VA's determination, because that determination makes no mention of Ostborg's wide-ranging hobbies and interests. In addition, the ALJ correctly explained the VA and SSA use different criteria for determining disability. *Compare* 38 C.F.R. § 3.340(a)(1), *with* 42 U.S.C. § 423(a)(1)(E), (d)(1)(A).

Notably, this case is distinguishable from *Brady* and *Rodriguez*. In contrast to *Brady*, the ALJ determined Ostborg suffered from severe impairments. *See Brady*, 724 F.2d at 917. Moreover, in contrast to the claimants in *Brady* and *Rodriguez*, Ostborg was not given a 100% disability rating from the VA; instead, his maladies fell short of meeting the VA's schedular requirements for disability, but he was given a permanent and total disability rating based on extraschedular factors. *See id.* ; *Rodriguez*, 640 F.2d at 686. Moreover, the VA's rating decision in Ostborg's case, provides scant explanation for applying those extraschedular factors to reach a determination of total disability, when the schedular factors do not meet the VA's disability criteria.

Ostborg's argument the ALJ failed to acknowledge medical records provided in support of the VA's decision is meritless. Much of the medical evidence summarized in the VA's decision was not in the record before the ALJ in this case. The ALJ's specific reasons for discounting the VA's determination show

17

he considered and closely scrutinized that determination; consequently, the ALJ

did not misapply the law in discounting it.  *See Moore*, 405 F.3d at 1211;

*Rodriguez*, 640 F.2d at 686.

B.    Substantial Evidence Supporting ALJ's Work Finding
      Ostborg argues the ALJ's RFC finding is unsupported by substantial

evidence, because the finding conflicts with medical evidence underlying the VA's

disability rating.  He also contends the ALJ failed to discuss the reasons for

disregarding Dr. Rose's opinion concerning his concentration and pace limitations

or the limitations created by his leg-length discrepancy.  Finally, Ostborg contends

he was unable to perform his previous jobs.  Regarding his security-guard job, he

argues the Dictionary of Occupational Titles provides security-guard work

involves responding quickly to unexpected circumstances.

We review the ALJ's decision for substantial evidence.  *Moore*, 405 F.3d at

1211.  "Substantial evidence is less than a preponderance, but rather such relevant

evidence as a reasonable person would accept as adequate to support a

conclusion."  *Id.*  The Social Security Regulations state a five-step process used to

determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520(a)(4).  Under

the first four steps of that process, the claimant must show: (1) he is not currently

engaged in substantial gainful activity; (2) he has a severe impairment; (3) his

impairment meets or equals the criteria in one of the listings of impairments; and

(4) his impairment prevents him from performing past relevant work, if it does not

meet or equal one of the impairments in the listings. *Id.* § 404.1520(a)(4)(i)-(iv). If the claimant shows he cannot perform his past relevant work, then, at the fifth step, the burden shifts to the Commissioner to show significant numbers of jobs exist in the national economy the claimant can perform. *Id.* § 404.1520(a)(4)(v).

At step four, the ALJ assesses the claimant's RFC and ability to perform past relevant work. *Id.* § 404.1520(a)(4)(iv). The RFC assessment is based on all relevant evidence of a claimant's abilities to do work despite his impairments. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1545(a)). "Light work" is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." *Id.* § 404.1567(b). A job in the light-work category may require "a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

The claimant bears the burden of showing he cannot perform his past relevant work. *Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990). A claimant must show he is unable to perform his past kind of work, not merely that he is unable to perform a specific job held in the past. *Jackson v. Bowen*, 801 F.2d 1291, 1293 (11th Cir. 1986) (citing 20 C.F.R. § 404.1520(e)). At the fourth step, the ALJ assesses the claimant's RFC. *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004). "[T]he regulations define RFC as that which the individual is

still able to do despite the limitations caused by his or her impairments." *Id.* (citing

20 C.F.R. § 404.1545(a)).  The ALJ makes the RFC determination based on all

relevant medical and other evidence in the case.  *Id.*

### 1.    ALJ's RFC Assessment

Substantial evidence supports the ALJ's determination Ostborg could

perform light work for 32 hours per week, despite his leg-length discrepancy.  *See*

*Moore*, 405 F.3d at 1211.  Ostborg obtained corrective shoes, which according to

his chiropractor, helped to compensate for his leg-length discrepancy.

Additionally, Ostborg testified he frequently walked and swam.  Consequently,

substantial evidence supports the ALJ's finding that Ostborg could perform light

work.  *See id.*

Contrary to Ostborg's contention, the ALJ gave sufficient reasons for the

determination his leg-length discrepancy limited him to light work.  The ALJ

described Ostborg's leg-length discrepancy in detail at step two of the analysis,

including the treatment he had obtained.  The ALJ also found, at step three,

Ostborg was able to function normally, evidenced by his exercising regularly.

Moreover, substantial evidence supports this conclusion because Ostborg's

October 2001 treatment notes show his musculoskeletal pain was well controlled

with chiropractic treatment and regular swimming, his chiropractor opined

Ostborg's corrective shoes helped compensate for his leg-length discrepancy, and

Ostborg testified he walked, swam, and did aerobics regularly. *See Moore*, 405 F.3d at 1211.

The medical reports and RFC assessments in the record support the ALJ's conclusion Ostborg was able to work on a part-time basis, despite any pace limitations. For instance, Dr. Rose opined (1) Ostborg was capable of performing most, if not all, tasks that he was previously able to perform, despite needing extra time and structure; (2) he could perform complex tasks with sufficient time and structure; and (3) his cognition and intelligence were otherwise sufficiently intact.

The ALJ discussed Dr. Rose's report and concluded Ostborg's cognitive limitations were mild, and Dr. Rose's assessment does not contradict that conclusion. Moreover, the ALJ explicitly accounted for Ostborg's lapses in concentration and inability to sustain sufficient concentration for a 40-hour work week. Ostborg's argument the ALJ's RFC decision is unsupported by substantial evidence, because it conflicts with the evidence underlying the VA's decision is meritless. The evidence underlying the VA's decision to which Ostborg refers, Dr. Jacobs's opinion Ostborg could perform only sedentary work for four hours a day, was not in the record. Instead, the record contained only the brief summary of that evidence, which was recited in the VA's decision.

21

2.    Ostborg's Ability to Perform his Past Relevant Work

Ostborg does not dispute his previous jobs as a house manager and in security services were past-relevant work for purposes of the Social Security regulations.  Ostborg's prior jobs involved mostly sitting, only occasional lifting objects less than ten pounds, some typing, and did not include supervising others. Nothing in the record shows these tasks were beyond his RFC.  He described his house-manager job as a desk job and acknowledged it was somewhat similar to his volunteer roles at the church and museum.  Ostborg's testimony his work as a house manager involved "a lot more people" and "a lot more to do" than his volunteer roles, does not show that such a role was beyond his abilities, because it is not clear that admitting more people would tax his abilities to process new information.  Instead, Ostborg described a greater frequency of the same task, and Ostborg has not shown he had difficulties repeating tasks. *See Lucas*, 918 F.2d at 1571.

Because Ostborg previously has not raised his argument concerning the nature of security-guard work as described in the Dictionary of Occupational Titles, we need not address it.  *See Kelley v. Apfel*, 185 F.3d 1211, 1215 (11th Cir. 1999) (declining to reach an argument not raised before the SSA or the district court that the ALJ should have relied on a VE's testimony).  Ostborg has not met

his burden of showing he could not perform his past relevant work. *See Lucas*, 918 F.2d at 1571.

C.     ALJ's Credibility Determination

Ostborg contends the ALJ identified only minor discrepancies in his various statements, such as his allegedly inconsistent statements concerning alcohol consumption. He contends these discrepancies and his wide range of hobbies and activities were insufficient to contradict his allegations of disability.

Credibility determinations are the province of the ALJ, and we will not disturb a clearly articulated credibility finding absent substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). When a claimant attempts to show disability through his own testimony about pain or other subjective symptoms, the ALJ must consider that testimony if the ALJ finds evidence of an underlying medical condition and either (1) objective medical evidence to confirm the severity of the alleged symptoms arising from that condition, or (2) the objectively determined medical condition is of a severity that reasonably can be expected to give rise to the alleged symptoms. *See Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). If the claimant establishes an underlying medical condition that reasonably could be expected to produce the symptoms, "all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical

23

signs and laboratory findings in deciding the issue of disability." *Id.* at 1561. If the ALJ decides not to credit a claimant's testimony regarding his subjective symptoms, the ALJ must articulate "explicit and adequate reasons for doing so." *Id.* at 1561-62. The ALJ may consider a claimant's daily activities in discrediting complaints concerning subjective conditions. *See Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984) (concluding the ALJ properly considered a variety of factors, including the claimant's daily activities, in making a finding about his allegations of severe pain).

In this case, the ALJ discussed Ostborg's mental limitations earlier in his decision and found them to be mild based on the objective medical evidence. In discussing Ostborg's credibility, the ALJ stated several specific reasons for discounting Ostborg's statements concerning his symptoms, and substantial evidence supports those reasons. *Foote*, 67 F.3d at 1561-62. Specifically, the ALJ found Ostborg was engaged in a wider array of activities than he originally had represented. Substantial evidence supports this determination, because Ostborg had failed to testify about his violin instruction, photography, art exhibition, and involvement in the stamp club. Moreover, the ALJ's consideration of Ostborg's wide range of activities was proper, because (1) Ostborg alleged he was unable to work, in part, because of his mental impairments, but (2) his wide ranging activities included activities the ALJ found to be similar or more mentally

24

challenging than his previous jobs.  *See Harwell*, 735 F.2d at 1293.  The ALJ's

discussion of other inconsistent statements, such as those concerning Ostborg's

alcohol consumption, even if erroneous, was harmless, since substantial evidence

supports the ALJ's credibility finding.  *See Mitchell*, 771 F.3d at 782; *Diorio v.*

*Walker*, 721 F.2d 726 728 (11th Cir. 1983) (concluding the ALJ's

mischaracterization of the claimant's post-relevant work was harmless error,

because such characterization of vocational factors was irrelevant when the ALJ

found no severe impairment).  The ALJ's credibility determination is supported by

substantial evidence.  *See Mitchell*, 771 F.3d at 782.

### III.  CONCLUSION

In summary, the ALJ did not misapply the law in determining the VA's

disability rating had little bearing on Ostborg's disability benefits claim.  In

addition, substantial evidence supported the ALJ's findings (1) Ostborg possessed

the RFC to perform light work on a part-time basis and his past relevant work; and

(2) his testimony concerning the persistence, severity, and limiting effects of his

impairments was not credible.

**AFFIRMED.**